THRIFTY OIL CO. & SUBSIDIARIES, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 1376–10.                    Filed August 30, 2012.

P filed consolidated Federal income tax returns for the
years at issue (TYE Sept. 30, 2000, 2001, and 2002) on which
it claimed environmental remediation expense deductions. R
disallowed the claimed deductions after determining that they
were each the second tax deduction P had claimed for a single
economic loss. The first deduction had been reported as a cap-
ital loss on P's Federal income tax return for TYE Sept. 30,
1996, and carried forward, with the last portion claimed on
P's Federal income tax return for TYE Sept. 30, 2001. *Held*:
P is not entitled to the environmental remediation expense
deductions claimed on its Federal income tax returns for TYE
Sept. 30, 2000, 2001, and 2002.

*Gary S. Colton, Jr.*, *Daniel A. Dumezich*, and *Richard E.
Kurkowski*, for petitioner.

*Kevin G. Croke*, *Davis G. Yee*, and *Matthew A. Williams*,
for respondent.

OPINION

WHERRY, *Judge*: This case is before the Court on a petition
for redetermination of income tax deficiencies determined by
respondent for petitioner's taxable years ended (TYE) Sep-
tember 30, 2000, 2001, and 2002. In its simplest form, the
issue is whether, given *Charles Ilfeld Co. v. Hernandez*, 292
U.S. 62 (1934), and its progeny, petitioner is entitled to
environmental remediation expense deductions claimed for
the years at issue when, economically, those same losses
were claimed as capital loss deductions for years not before
the Court.

198

*Background*

This case was submitted fully stipulated pursuant to Rule 122.[1] The parties' stipulations of issues and stipulations of facts, with accompanying exhibits, are incorporated herein by this reference. Petitioner is a California corporation and its subsidiaries with its principal place of business in Santa Fe Springs, California.

I. *Overview of Petitioner*

Thrifty Oil Co. (Thrifty) is the common parent of an affiliated group of corporations that for 1995 through 2002 (relevant years) filed consolidated Federal income tax returns using a September 30 yearend and the accrual method of accounting. During the relevant years Thrifty's direct and indirect subsidiaries included: (1) Earth Management Co. (Earth Management); (2) Golden West Refining Co. (Golden West); (3) Golden West Distribution Co. (Distribution Co.); and (4) Benzin Supply Co. (Benzin).

Ted Orden was the president and controlling shareholder of petitioner during the relevant years. Moshe Sassover, Barry Berkett, and Robert Flesh are sons-in-law of Ted Orden. Mr. Sassover and Mr. Berkett were employees of Thrifty and Mr. Flesh worked for Thrifty and the Thrifty consolidated group as an independent contractor during the relevant years.

II. *Refinery Property and Bankruptcy*

In 1983 Thrifty, through Golden West, acquired property in Santa Fe Springs, California, on which an oil refinery was located (Golden West Refinery property).[2] The oil refinery proved unprofitable, and in February 1992 refining operations were suspended. As a result of refining operations, the Golden West Refinery property had suffered environmental contamination, leaving Thrifty and Golden West with the responsibility for remediating the environmental problems.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Before Sept. 28, 1998, Distribution Co., was the holding company for Golden West. On Sept. 28, 1998, Distribution Co. was merged into Golden West. Until the merger, Golden West was 100% owned by Distribution Co., which was 100% owned by Thrifty. After the merger, Golden West was 100% owned by Thrifty.

On July 31, 1992, Thrifty and certain of its subsidiaries including Golden West filed for bankruptcy protection under chapter 11 of the Bankruptcy Code. *See* Bankruptcy Petition *In re Thirfty Oil*, No. 92–09132–LA11 (Bankr. S.D. Cal.). On February 16, 1995, the bankruptcy court confirmed the plan of reorganization. Petitioner's environmental remediation liabilities, which had a major impact on the chapter 11 reorganization, were not discharged.

III. *Environmental Remediation Strategy*

In 1996 petitioner, on the advice of individuals at Deloitte & Touche LLP (Deloitte), including Robert Wenger, petitioner's long-time adviser, decided to enter into a strategy to consolidate the contingent environmental remediation liabilities into one entity (environmental remediation strategy).[3] As of September 1996, the contingent environmental remediation liabilities with respect to the Golden West Refinery property totaled $29,070,000.

In an interoffice memorandum dated August 1, 1996, detailing the environmental remediation strategy, Mr. Sassover stated:

As a result of the strategy, Thrifty may be able to generate a capital loss of approximately $60 million. The basic concept is to contribute Thrifty and Golden West Refining's environmental liabilities to a subsidiary of Thrifty while also contributing intercompany receivables. * * * Due to an IRS published ruling and the consolidated return regulations, the transaction with the subsidiary generates a capital loss immediately. When the consolidated group expends funds on the environmental remediation, the consolidated group is entitled to a deduction.

On September 27, 1996, Golden West and Earth Management engaged in a section 351 transaction. For 90 shares of Earth Management stock, Golden West transferred a $29,100,000 promissory note executed by Benzin (Benzin note) in favor of Golden West to Earth Management and

---

[3] In addition to the environmental liabilities at the Golden West Refinery property, Thrifty faced significant costs due to environmental regulations at gasoline stations that it operated. The environmental liabilities associated with the gasoline stations were estimated to be $19,126,000. Petitioner also entered into the environmental remediation strategy with respect to these environmental liabilities; the transaction gave rise to a $5,836 capital loss. However, because respondent has not challenged the transaction involving Thrifty's liabilities at the gasoline stations, we need not discuss it further. For a full exposé of Deloitte's proprietary "Double Deduction" tax product strategy during this timeframe see *Gerdau Macsteel, Inc. v. Commissioner*, 139 T.C. 67, 82–84 (2012).

Earth Management assumed Golden West's $29,070,000 contingent environmental remediation liabilities.

The Benzin note required Benzin to pay Golden West principal of $29,100,000 together with interest at a rate of 11.5% per annum calculated from September 20, 1996, until the principal sum was paid in full. The Benzin note was a balloon note and specified a maturity date of September 30, 2006. As of May 16, 2011, no payments of principal or interest had been made on the Benzin note. The Benzin note was intended to provide Earth Management with additional collateral to facilitate borrowing any funds needed to pay the environmental remediation liabilities as they came due, but it was never pledged as collateral on any borrowing by Earth Management.

Golden West claimed a tax basis in its 90 shares of Earth Management stock equal to the face value of the Benzin note ($29,100,000) without adjusting for the $29,070,000 of contingent environmental remediation liabilities Earth Management assumed. *See* secs. 358(a), (d), 357(c)(3).[4] Petitioner filed a statement with its TYE September 30, 1996, Federal income tax return, disclosing the tax treatment of the transaction (disclosure statement). The disclosure statement reported that Golden West had transferred a promissory note with a fair market value (FMV) and tax basis of $29,100,000 and environmental remediation liabilities with an FMV of $29,070,000 and tax basis of zero to Earth Management for total property transferred with an FMV of $30,000 and a tax basis of $29,100,000. The disclosure statement also reported that the 90 shares of Earth Management stock Golden West received had an FMV of $400 per share.[5]

---

[4] In cases with similar factual backgrounds, the Courts of Appeals for the Fourth and Federal Circuits have both held that pursuant to the Code, the basis of the stock received was increased by the value of the promissory note transferred but not reduced by contingent liabilities assumed. *Coltec Indus. Inc. v. United States*, 454 F.3d 1340, 1351 (Fed. Cir. 2006); *Black & Decker Corp. v. United States*, 436 F.3d 431, 434–440, 443 (4th Cir. 2006). The courts did not stop there. In *Coltec Indus. Inc.*, the Court of Appeals for the Federal Circuit went on to find that the transfer "had no meaningful economic purpose, save the tax benefits to Coltec" and "must be ignored for tax purposes." *Coltec Indus. Inc.*, 454 F.3d at 1347. In *Black & Decker Corp.*, the Court of Appeals for the Fourth Circuit remanded the case to the lower court for a determination of whether the transaction was a sham. *Black & Decker Corp.*, 436 F.3d at 442–443. The case then settled before trial. Today, sec. 358(h) would require that basis be reduced by the amount of the transferred liabilities.

[5] Ninety shares received at a total value of $30,000 could lead to the conclusion that each share of stock was worth $333.33. And it is not exactly clear to this Court why each share of stock was reported as being worth $400. However, we surmise it was because Earth Manage-

Continued

IV. *Double the Benefits*

A. *First Tax Benefit*

On September 30, 1996, Golden West sold its Earth Management stock in equal amounts to Mr. Sassover, Mr. Berkett, and Mr. Flesh for $8,400 each (total of 90 shares sold for $25,200 or $280 per share).[6] Petitioner reported a capital loss of $29,074,800 on its TYE September 30, 1996, Federal income tax return from the sale (amount realized of $25,200 less basis of $29,100,000). Petitioner deducted $2,882,469 of the capital loss on its TYE September 30, 1996, Federal income tax return, and carried the remainder forward.

Petitioner deducted a total of $18,347,205 of the capital loss on its TYE September 30, 1996, 1997, 1998, and 1999, Federal income tax returns.[7] Each of these four years was closed to adjustment by the statute of limitations at the time of this dispute. Petitioner claimed deductions for the remaining $10,727,595 of the capital loss on its TYE September 30, 2000 and 2001, Federal income tax returns. As discussed *infra*, the capital loss carryforwards petitioner claimed on its TYE September 30, 2000 and 2001, Federal income tax returns were disallowed by respondent in his notice of deficiency.

B. *Second Tax Benefit*

Earth Management made expenditures during the relevant years for the actual cleanup of the Golden West Refinery property. Thrifty provided the funds Earth Management used to pay for the costs related to the environmental cleanup. For these expenditures, petitioner claimed environmental remediation expense deductions of $339,435, $1,854,405, and

---

ment was not a new subsidiary formed solely for the purpose of the environmental remediation strategy and therefore the $30,000 worth of property Golden West transferred was not the only property Earth Management held. *See infra* note 6.

[6] Deloitte determined the $280-per-share value by discounting the $400-per-share value reported in the disclosure statement by 30% to account for the stock's lack of marketability. In addition to the 90 shares of Earth Management stock Golden West sold, there were another 150 shares of Earth Management common stock outstanding. Sixty of these shares had been received by Thrifty when it entered into the environmental remediation strategy with regard to the environmental remediation liabilities at Thrifty's gasoline stations. *See supra* note 3. The remaining 100 shares were also held by Thrifty and had been outstanding for some time.

[7] Specifically, petitioner claimed capital loss deductions of $2,882,469, $5,348,310, $3,755,873, and $6,360,553 on its Federal income tax returns for TYE September 30, 1996, 1997, 1998, and 1999, respectively.

$14,505,358 on its TYE September 30, 1997, 1998, and 1999, Federal income tax returns. These years are closed to adjustment by the statute of limitations. Petitioner claimed environmental remediation expense deductions for the years at issue in the following amounts:

| TYE Sept. 30 | Amount |
|---|---|
| 2000 | $3,109,962 |
| 2001 | 4,108,429 |
| 2002 | 3,891,571 |
| Total | 11,109,962 |

## V. *Respondent's Determination*

Respondent issued a notice of deficiency dated October 22, 2009, in which he disallowed capital loss carryovers claimed for TYE September 30, 2000 and 2001, of $1,426,576 and $9,301,019, respectively, [8] and environmental expense deductions claimed for TYE September 30, 2000, 2001, and 2002, of $4,370,802, $4,108,429, and $3,891,571, respectively. [9] The stated reasons for disallowing both the capital loss carryovers and the environmental remediation expense deductions included that they "duplicate tax benefits already claimed for a single economic loss." Respondent determined the following deficiencies and penalties:

| | | Penalties | |
|---|---|---|---|
| TYE Sept. 30 | Deficiency | Sec. 6662(a) | Sec. 6662(h) [1] |
| 2000 | $1,552,450 | $310,490 | --- |
| 2001 | 5,192,608 | 287,590 | $1,501,863 |
| 2002 | 1,325,984 | 265,197 | --- |

[1] Respondent determined that petitioner was liable for a sec. 6662(h) 40% gross valuation misstatement penalty for the portion of the underpayment attributable to the capital loss carryforwards.

Petitioner timely petitioned this Court. In a stipulation of settled issues filed April 8, 2011, petitioner conceded that its

---

[8] The $1,426,576 capital loss disallowance for TYE September 30, 2000, resulted in no tax effect for that year. Instead it reduced the capital loss carryover to the subsequent tax year and when combined with the disallowed 2001 capital loss carryover of $9,301,019 created a $10,727,595 adjustment to the capital loss for TYE September 30, 2001.

[9] See *infra* p. 204 and note 10 for a discussion of why respondent disallowed environmental remediation expense deductions for TYE September 30, 2000, in an amount greater than that claimed by petitioner.

capital gain for TYE September 30, 2001, should be increased by $10,727,595, and respondent conceded petitioner was not liable for a section 6662(a) or (h) accuracy-related penalty with respect to the disallowed capital loss carryovers. In a stipulation of settled issues filed October 27, 2011, respondent conceded petitioner was not liable for a section 6662(a) accuracy-related penalty with respect to the disallowed environmental remediation expense deductions. In a stipulation of settled issues filed December 13, 2011, the parties stipulated that petitioner claimed a deduction for environmental remediation expenses incurred in cleaning up the Golden West Refinery property for TYE September 30, 2000, of only $3,109,962, and accordingly respondent conceded $1,260,840 of environmental remediation expense deductions originally disallowed in the notice of deficiency. [10]

On December 21, 2011, the parties filed a joint motion to submit this case under Rule 122. We granted the joint motion on January 3, 2012, and set a briefing schedule. On February 14, 2012, Duquesne Light Holdings, Inc. & Subsidiaries (Duquesne) filed a motion for leave to file a brief amicus curiae in support of petitioner. [11] We granted Duquesne's motion and filed the amicus brief on March 21, 2012. On May 9, 2012, respondent's reply to Duquesne's amicus brief was filed. On May 30, 2012, Duquesne's response to respondent's reply was filed.

## Discussion

After the stipulations, we are left with just one question: Is petitioner entitled to environmental remediation expense deductions claimed on its Federal income tax returns for TYE September 30, 2000, 2001, and 2002? Respondent's sole argu-

---

[10] For financial accounting purposes, Earth Management's assumption of Golden West's contingent liabilities was accounted for by the creation of a reserve account. Specifically, the assumption was reflected on Earth Management's books as a $29,070,000 credit to an account entitled "Environmental Reserve—GWR". When the exact amount and the payee of an environmental expense were determined, the reserve account would be debited and accounts payable credited. When payments were made for the specific accounts payable, cash would be credited and accounts payable debited. Additionally, the reserve account was reviewed at the end of each year; and if an adjustment was needed, a postclosing entry would be made the following year. In a year in which there were no postclosing adjustments to the reserve account, the tax deduction would equal the net change in the reserve account. For TYE September 30, 2000, the reserve account showed a net decrease of $4,370,802. This is where respondent obtained the amount he disallowed in the notice of deficiency.

[11] Duquesne currently has a case pending before this Court at docket No. 9624–10.

ment is that the claimed deductions duplicate $18,347,205 in capital loss deductions petitioner claimed for years not before the Court, and hence petitioner is not entitled to up to $18,347,205 of the claimed environmental remediation expense deductions. [12]

## I. *Double Deductions—Generally, the Tax Court, and the Ninth Circuit*

### A. *Current State of the Law*

Double deductions (or their practical equivalent) for the same economic loss are impermissible absent a clear declaration of congressional intent. *Charles Ilfeld Co.*, 292 U.S. at 68; *Marwais Steel Co. v. Commissioner*, 354 F.2d 997, 998–999 (9th Cir. 1965) (stating the court would follow the message in *Charles Ilfeld Co.* "in cases having any similarity at all on double deductions for a single economic loss"), *aff'g* 38 T.C. 633 (1962); *see also McLaughlin v. Pac. Lumber Co.*, 293 U.S. 351, 355 (1934) (holding that "a consolidated return must truly reflect taxable income of the unitary business and consequently it may not be employed to enable the taxpayer to use more than once the same losses for reduction of income"); *Spokane Dry Goods Co. v. Commissioner*, 125 F.2d 865, 867 (9th Cir. 1942) (noting that the court was constrained "by the rule against interpretations which allow a double deduction"), *aff'g* 43 B.T.A. 793 (1941); *Willamette Indus., Inc. v. Commissioner*, T.C. Memo. 1991–389 (acknowledging that "[a] fundamental tax principle is that a taxpayer cannot receive a double deduction or claim a double credit for the same item"); *Mo. Pac. Corp. v. United States*, 5 Cl. Ct. 296, 302 (1984) (decreeing that it is a fundamental principle that one cannot get a double deduction for the same expense). This rule applies even when the deductions are based on separate and distinct sections of the Code. *Rome I, Ltd. v. Commissioner*, 96 T.C. 697, 704–705 (1991) (citing *Charles Ilfeld Co.*, 292 U.S. at 68, *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969), and *O'Brien v. Commissioner*, 79 T.C. 776, 786–788 (1982), *aff'd and remanded on other issues*, 771 F.2d 476 (10th Cir. 1985)).

---

[12] Whether the claimed deductions meet the deductibility requirements of secs. 162 and 461 is not at issue. Respondent concedes that they do.

To find a clear declaration of congressional intent, a taxpayer must point to "a specific statutory provision authorizing a double deduction". *United Telecomms., Inc. v. Commissioner*, 589 F.2d 1383, 1388 (10th Cir. 1978), *aff'g* 65 T.C. 278 (1975). General allowance provisions are insufficient; and when the statute is silent, it is presumed that double deductions are not allowed. *O'Brien v. Commissioner*, 79 T.C. at 786–788; *see also Rome I, Ltd. v. Commissioner*, 96 T.C. at 704–705 (finding an impermissible double tax benefit when a taxpayer claimed both a tax credit and a charitable contribution deduction); *Brenner v. Commissioner*, 62 T.C. 878, 884–885 (1974) (pointing out that section 162(a) did not reflect a "clear declaration of intent by Congress" to allow a double deduction).

B. *Tax Court*

The Tax Court has applied the Supreme Court's pronouncement of the *Ilfeld* doctrine in several cases, three of which we will examine here. In *Woods Inv. Co. v. Commissioner*, 85 T.C. 274, 276–277 (1985), the taxpayer sold all of the stock of four wholly owned subsidiaries. The subsidiaries had used accelerated methods to depreciate their business property when permitted. *Id.* at 276. The issue was the amount of the taxpayer's basis in the stock of its subsidiaries for purposes of determining the gain on the sale. *Id.* at 277. The Court first looked at section 1.1502–32, Income Tax Regs., which provided rules for adjusting the basis of a subsidiary's stock held by a parent. *Id.* at 278. Pursuant to this section, basis adjustments were made in accordance with the subsidiaries' earnings and profits. [13] *Id.* at 278–279. Then the Court looked at section 312(k), which provided that in computing earnings and profits, the allowance for depreciation was deemed to be the amount which would be allowable if the straight-line method of depreciation were used. *Id.* at 278.

---

[13] The parent's basis in the stock of its subsidiary is adjusted by the difference between the required positive adjustments and the required negative adjustments. Sec. 1.1502–32, Income Tax Regs. Generally, the amount of a subsidiary's yearend undistributed earnings and profits that increases consolidated taxable income results in a positive adjustment and increases the parent's basis in the stock. Sec. 1.1502–32(b)(1)(i), Income Tax Regs. A loss of a subsidiary that is used to reduce the affiliated group's consolidated income results in a negative adjustment and decreases the parent's basis in the subsidiary's stock. Sec. 1.1502–32(b)(2)(i), Income Tax Regs.

The taxpayer computed earnings and profits in accordance with section 312(k), arguing this was proper. The Commissioner found fault with this and argued that the taxpayer had to use accelerated depreciation because otherwise the taxpayer was obtaining a "double deduction".[14] *Id.* at 279. We agreed with the taxpayer. We distinguished *Charles Ilfeld Co.* on the grounds that the Supreme Court had stated that a double deduction would not be allowed "'in the absence of a provision in the Act or regulations that fairly may be read to authorize it'" and here there was such a provision. *Id.* at 282.

Section 1.1502–32, Income Tax Regs., however, deals comprehensively with this problem by requiring in paragraph (b)(2)(i) that the basis of the stock of the loss subsidiary in the hands of the parent be reduced by any deficit in the earnings and profits. That regulation also prevents a double inclusion in income by providing in paragraph (b)(1)(i) that the basis of the subsidiary's stock be increased by the subsidiary's undistributed earnings and profits. Thus, even assuming petitioner is receiving a double deduction, we believe that the detailed rules in section 1.1502–32 * * * together with section 312(k), can fairly be read to authorize the result herein, and, therefore, *Ilfeld Co.* is inapplicable. [*Id.* at 282–283.]

We later acknowledged our holding in *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. 398, 405 (1994), *aff'd*, 62 F.3d 136 (5th Cir. 1995), where we stated that in *Woods Inv.* we concluded *Charles Ilfeld Co.* was "inapplicable because section 312(k) together with section 1.1502–32, Income Tax Regs., authorized the result we reached."

*Wyman-Gordon Co. & Rome Indus. Inc. v. Commissioner*, 89 T.C. 207 (1987), also involved the determination of a subsidiary's earnings and profits. The specific issue was whether discharge of indebtedness income realized by the subsidiary should be included in earnings and profits, reducing the parent's excess loss account to zero,[15] even

---

[14] Essentially, the lower the amount of depreciation used in the calculations, the higher earnings and profit would be, which in turn would make the parent's basis in the stock of the subsidiaries higher and lead to a lower amount of gain on the sale of stock.

[15] As discussed *supra* note 13, a parent's basis in its subsidiary's stock is adjusted according to the subsidiary's earnings and profits, the annual adjustment being the net of the positive and negative adjustments. If a yearend net negative adjustment exceeds the parent's basis in the stock of a subsidiary, the parent must establish an "excess loss account" with respect to the stock it owns. Sec. 1.1502–32, Income Tax Regs. When a parent corporation sells or otherwise disposes of stock in a subsidiary, the parent is required to include in income the balance of any excess loss account outstanding with respect to its stock in that subsidiary immediately before the disposition event occurred. Sec. 1.1502–19(a)(1)(i), Income Tax Regs. In *Wyman-Gordon Co.*
Continued

though the discharge of indebtedness income was not included in consolidated taxable income pursuant to section 108(a)(1) (the subsidiary was insolvent). *Id.* at 215. Including it in earnings and profits would effectively allow the affiliated group of corporations excessive tax benefits by avoiding recognition of latent income otherwise existing in the excess loss account balance. *Id.* The Court looked at the regulations and found no provision as to how discharge of indebtedness income factors into the computation of earnings and profits and so held it should not increase earnings and profit in this situation. *Id.* at 218–219. We distinguished *Woods Inv.* on the grounds that there section 312(k) specifically required earnings and profits to be computed on the basis of straight-line depreciation, whereas in *Wyman-Gordon* there existed no comparable statutory provision requiring inclusion of discharge of indebtedness income in earnings and profits. *Id.* at 219.

Finally, in *CSI Hydrostatic Testers, Inc. v. Commissioner*, 103 T.C. at 403, 405, we considered the same issue as in *Wyman-Gordon*. However, in the years intervening between the two cases Congress had enacted section 312(l), which required discharge of indebtedness income to be included in earnings and profits. Because there was a specific provision leading to the double deduction, the Court allowed it. *Id.* at 411.

These three cases illustrate how the *Ilfeld* doctrine has been applied by the Court. In two of the cases, *Woods Inv.* and *CSI Hydrostatic*, the taxpayer could point to a specific provision showing Congress' intent to allow the double deductions, and so we allowed the second deduction. In the third there was no provision, and so the Court disallowed the second deduction.

C. *The Ninth Circuit*

Because of this Court's holding in *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971), we

---

& *Rome Indus. Inc. v. Commissioner*, 89 T.C. 207 (1987), the subsidiary had realized net operating losses which reduced the consolidated taxable income and left the subsidiary with a deficit earnings and profits account. This, in turn, reduced the parent's basis in the subsidiary's stock below zero and created an excess loss account. The regulations also expressly provided that the realization of discharge of indebtedness income not included in taxable income constitutes a disposition event and triggers recognition of the excess loss account. Sec. 1.1502–19(a)(2)(ii), Income Tax Regs.

are bound by precedent from the Court of Appeals for the Ninth Circuit, the court to which this case is appealable absent a stipulation of facts to the contrary. Three Ninth Circuit cases are of importance here: *Commissioner v. Laguna Land & Water Co.*, 118 F.2d 112 (9th Cir. 1941), *Marwais Steel Co. v. Commissioner*, 354 F.2d 997, and *Stewart v. United States*, 739 F.2d 411 (9th Cir. 1984).

In *Commissioner v. Laguna Land & Water Co.*, 118 F.2d at 114, the taxpayer bought a tract of land and subdivided it into lots. In early years not before the court, an erroneously high basis had been applied and the entire basis used. *Id.* at 114–116. The Commissioner argued that no basis should be allocated to sales in years before the court because this would be a double deduction. *Id.* at 117. The taxpayer asserted that a proportionate amount of the true basis should be allowed in the years at issue. *Id.* The Board of Tax Appeals held for the taxpayer, and the Court of Appeals affirmed. Important to this holding was a regulation in effect at the time which provided:

Sale of real property in lots.—Where a tract of land is purchased with a view to dividing it into lots or parcels of ground to be sold as such, the cost or other basis shall be equitably apportioned to the several lots or parcels and made a matter of record on the books of the taxpayer, to the end that any gain derived from the sale of any such lots or parcels which constitutes taxable income may be returned as income for the year in which the sale is made. This rule contemplates that there will be a measure of gain or loss on every lot or parcel sold, and not that the capital in the entire tract shall be returned. The sale of each lot or parcel will be treated as a separate transaction, and gain or loss computed accordingly. [*Id.* at 114–115. [16]]

The Court of Appeals found that the regulation had the effect and force of law and mandated the result the taxpayer sought. *Id.* at 115, 117–118. [17]

---

[16] The quoted regulation appeared as art. 61 of Treasury Regulation 74 promulgated under the Internal Revenue Act of 1928. *See Commissioner v. Laguna Land & Water*, 118 F.2d 112, 114 (9th Cir. 1941).

[17] Important here is the Court of Appeals' statement in *Commissioner v. Laguna Land & Water*, 118 F.2d at 117, that

Nor is the contention of the Commissioner correct that an over allowance of base cost to certain lots sold in earlier years makes the proper base cost deduction on other lots sold in a subsequent year a 'double deduction' such as is considered in * * * *Ilfeld Co. v. Hernandez*, * * *. None of these cases holds that an improper deduction from the gross receipts from a specific piece of property sold in one year may be corrected by refusing a deduction upon the sale of a difference piece of property in a different year.

Continued

*Marwais Steel Co. v. Commissioner*, 354 F.2d at 997, involved bad debt deductions claimed by the parent on loans made to a subsidiary and the subsidiary's operating losses the parent later assumed. Marwais Steel Co. (Marwais) lent its wholly owned subsidiary, Wilmington Metal Manufacturing Co. (Wilmington), $57,857.35. *Id.* Wilmington was never successful, and the amount was forgiven on the eve of Wilmington's eventual dissolution. *Id.* Marwais had previously claimed additions to its reserve for bad debts resulting in tax deductions of $22,000 on its 1953 tax return and $35,122.35 on its 1957 tax return as a result of the loans it had made to Wilmington. *Id.* at 997–998. At the time of Wilmington's liquidation, Marwais claimed a deduction that represented the net operating losses of $59,774.87 of Wilmington. *Id.* at 997. Specifically, Marwais claimed a deduction of $23,967.52 on its 1957 tax return and carried the remaining $35,807.35 over to its 1958 tax return. *Id.* The Commissioner argued that because Marwais had claimed $57,122.35 in bad debt deductions, it was not entitled to $57,122.35 of the claimed operating loss deductions because they represented the same economic loss. *Id.* at 998. We agreed with the Commissioner, and the Court of Appeals affirmed. *Id.* Importantly, the Court of Appeals stated:

> We conclude, as the tax court did, plausible as the position of Marwais is, *there is a message in Ilfeld Co. v. Hernandez, Collector*, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127, another double tax deduction disallowed. We follow taxpayer's argument that part of what was there said was dicta. And, of course, the sequence of facts there is reversed from what we have here. If what it said there was dicta, we believe that it is dicta *the court will follow in cases having any similarity at all on double deductions for a single economic loss*. [*Id.* at 998–999; emphasis added. [18]]

We do not read this case as being inconsistent with the law on double deductions. It simply acknowledges the regulation providing that the determination of cost and the gain or loss for each parcel should be separately determined for tax purposes. *See Stewart v. United States*, 739 F.2d 411, 415 (9th Cir. 1984).

[18] In its amicus brief, Duquesne states: "The First Circuit Court of Appeals, however, reached the opposite conclusion on facts very similar to *Marwais*." *See Textron, Inc. v. United States*, 561 F.2d 1023 (1st Cir. 1977). Even if true, this case is not appealable in the First Circuit. We also note *Textron* dealt with a parent and a subsidiary that did not file a consolidated return, a point which was carefully noted by the court in *Textron*. *Id.* at 1026 (stating: "We have grave doubts about the dissent's casual eliding of the distinction between parent and subsidiary. They are separate taxpayers. In the absence of a consolidated return, * * * treating the two corporations as one may not be justified."). We recognize that *Marwais Steel Co.* did not involve a consolidated return. *Marwais Steel Co. v. Commissioner*, 354 F.2d 997, 997 n.1 (9th Cir. 1965), *aff'g* 38 T.C. 633 (1962). But petitioner files consolidated returns, thus distinguishing it from the taxpayer in *Textron*.

In *Stewart*, the taxpayers reported gain from the sale of a water utility using the installment sale method. *Stewart*, 739 F.2d at 412. In determining the amount of the gain, the taxpayers originally calculated their basis in the water utility sold as $671,758.88 and deducted $161,593 against a $325,000 installment payment as a return of basis for 1968, a year closed to adjustment by the statute of limitations. *Id.* at 412, 414. They then discovered they were wrong and that the actual basis was $28,268. *Id.* at 412. The taxpayers wanted to deduct a proportionate share of the true basis for 1969 and 1970 even though they had already erroneously deducted more than the total basis for 1968. *Id.* at 414. The District Court allowed the taxpayers to do so, but the Court of Appeals reversed. *Id.* at 415 (citing *Robinson v. Commissioner*, 181 F.2d 17, 18 (5th Cir. 1950), *aff'g* 12 T.C. 246 (1949)). In response to the taxpayer's reliance on *Laguna Land & Water Co.*, the Court of Appeals stated that

the *Laguna* decision rested on the fact that the regulations required the taxpayer "to treat each parcel sold as a separate capital transaction having a separate basic cost and yielding a separate profit in the year of its sale." * * * [118 F.2d at 117.] In contrast, there is no indication that Congress intended installment sales to be treated as a number of separate transactions. Installment reporting is not even required; the taxpayer may elect not to use it. * * * [*Id.*]

Petitioner, focusing on language in *Commissioner v. Laguna Land & Water Co.*, 118 F.2d at 117, and quoting from *Stewart*, 739 F.2d at 415, contends "that the government cannot make up for its failure to correct an erroneous deduction in one year by disallowing a deduction in a separate transaction." Petitioner then paraphrases this language to argue that "the government is attempting to make up for its failure to correct an erroneous deduction in one transaction [Great West's sale of its Earth Management stock] by disallowing a deduction in a separate transaction [Earth Management's environmental clean-up activities with respect to the Refinery property]."

We do not believe the language warrants the emphasis petitioner gives to it. It simply arose out of the regulation in *Laguna Land & Water* mandating that "The sale of each lot or parcel will be treated as a separate transaction." As already discussed *supra* note 17, the court in *Laguna Land*

*& Water* found that regulations in effect at that time mandated that the sale of each lot be treated as a separate transaction. This was sufficient to demonstrate congressional intent to allow the double deduction. Over 20 years after *Laguna Land & Water* was decided, the Court of Appeals held it would follow *Charles Ilfeld Co.* in "cases having any similarity at all on double deductions for a single economic loss". *Marwais Steel Co. v. Commissioner*, 354 F.2d at 998–999. In that case, no mention was made of *Laguna Land & Water Co.* or separate and different transactions. The Court of Appeals for the Ninth Circuit, like the Tax Court, follows the *Ilfeld* doctrine. If a taxpayer can point to a specific provision demonstrating congressional intent to allow the double deduction, the second deduction would be authorized. If the taxpayer cannot show congressional intent, then the double deduction would not be allowed.

II. *The Law Applied to Petitioner*

If the deductions represent the same economic loss to petitioner and petitioner cannot point to a specific provision demonstrating Congress' intent to allow the double deductions, then the claimed environmental remediation expense deductions must be disallowed.

A. *Whether the Deductions Represent the Same Economic Loss*

Petitioner asserts that the capital loss and the environmental remediation expense deductions do not represent the same economic loss. We disagree. Both the capital loss and the environmental remediation expense deductions represent costs associated with the cleanup of the Golden West Refinery property. The capital loss represents the unpaid liability, and the environmental remediation expense deductions represent the actual cost when paid. This—deducting the unpaid liability in the form of a capital loss and then deducting it again when paid—is the core problem of this case. Petitioner raises two arguments which we will address as to why they do not represent the same economic loss.

1. *Calculation of Basis*

Petitioner states: "GWRC's [Golden West's] capital loss on the sale of its EMC [Earth Management] stock did not represent an economic loss for the environmental cleanup of the Refinery Property, but rather was the result of the manner in which basis was required to be computed under the provisions of the Code". Section 1001(a) provides that loss "from the sale or other disposition of property * * * shall be the excess of the *adjusted basis* * * * over the *amount realized*." (Emphasis added.) Hence, contrary to petitioner's assertion, calculation of basis, while important, is not the only factor when determining a loss. One must also consider amount realized. Section 1001(b) provides that "[t]he amount realized from the sale or other disposition of property shall be the sum of any money received".

The amount realized was $25,200 and basis was $29,100,000, leading to a loss of $29,074,800.[19] Basis took into account the face value of the Benzin note but *did not* take into account the contingent environmental remediation liabilities (the expected amount it would cost to clean up the Golden West Refinery property). The amount realized took into account both the Benzin note and the contingent environmental remediation liabilities. Therefore, the capital loss arose not as a result of how basis was calculated but as a result of the contingent environmental remediation liabilities being taken into account in calculating the amount realized (or fair market value) but not in calculating basis.[20]

[19] The sale price of the Earth Management stock was $280 per share for a total of $25,200 (90 shares × $280). An appraisal report prepared by Deloitte states: "as of September 1, 1996, the fair market value of a minority and noncontrolling interest in the common equity of Earth Management Company is reasonably estimated to be $70,000 or $280 per share." Therefore, the amount realized equals the fair market value in this case.

[20] Petitioner also argues that "Because GWRC's [Golden West's] capital loss did not represent an economic loss from the cleanup of the Refinery Property, Earth Management's subsequent environmental remediation expense deductions cannot constitute a second deduction for the same economic loss." We recognize that no economic loss occurred when petitioner sold the Earth Management stock, leading to the capital loss; however, we consider this to be immaterial. That one economic loss occurs and two tax losses are claimed is a trademark of double deduction cases. For example, in *Comar Oil Co. v. Helvering*, 107 F.2d 709 (8th Cir. 1939), the taxpayer opened a reserve account in 1926 in anticipation of losses that would be incurred when warehouse material was sold or junked. *Id.* at 710. It credited to the reserve $120,000 and claimed a deduction in that amount on its 1926 tax return. *Id.* In 1929 the taxpayer's actual losses from the warehouse were $208,189.04, and on its 1929 tax return the taxpayer claimed a deduction in that amount. *Id.* The court agreed with the Commissioner that the claimed $208,189.04 deduction should be reduced by the remaining reserve account balance of

Continued

## 2. *The Benzin Note v. Cash Advances From Thrifty*

Petitioner next argues the deductions are economically not the same because "the asset that established GWRC's [Golden West's] basis in the EMC [Earth Management] stock (the Benzin note) was not the same asset that gave rise to EMC's [Earth Management] environmental remediation expense deductions (the Thrifty cash advances)." Petitioner apparently believes that if the Benzin note had been used to pay the environmental expenses to clean up the Golden West Refinery property, then the capital loss and the environmental remediation liabilities would represent the same economic loss. But because the liabilities were paid from money Thrifty advanced to Earth Management, they are not. We view this as nothing more than a distinction without a difference.[21] Payment of the environmental remediation liabilities reduced Earth Management's assets (and the consolidated group's as a whole) regardless of where that money came from.

## B. *No Specific Provision Demonstrating Intent*

As the capital loss deductions and the environmental remediation expense deductions represent the same economic loss, petitioner must point to a specific provision authorizing the double deduction. Petitioner fails in this regard, pointing only to section 162. As stated, general allowance provisions are insufficient, and this Court has previously held that section 162 does not reflect a "clear declaration of intent" to allow a double deduction. *O'Brien v. Commissioner*, 79 T.C. at 786–788; *Brenner v. Commissioner*, 62 T.C. at 884–885. Accordingly, petitioner is not entitled to the environmental remediation expense deductions claimed on its Federal

---

$87,824.30 for which a deduction had previously been allowed in 1926. *Id.* at 711. The fact that the deduction claimed on the 1926 tax return did not represent an economic loss whereas the deduction claimed on the 1929 return did represent an economic loss did not matter. The court acknowledged that the double deduction cases cited involved situations where an economic loss had actually occurred and been allowed as a deduction for a preceding year and then claimed a second time. In the case before it "the loss was anticipated and a deduction claimed and allowed for it in a year preceding the occurrence of the actual loss." *Id.* However, the court found "no difference in principle", and the claimed second loss was not allowed. *Id.*

[21] The Benzin note's stated purpose was to provide Earth Management with additional collateral to facilitate borrowing any funds needed to pay the contingent environmental remediation liabilities as they came due. However, the Benzin Note was never pledged as collateral on any borrowing by Earth Management and as of May 16, 2011, no payments of principal or interest had been made on the Benzin Note, despite the September 30, 2006, maturity date.

income tax returns for TYE September 30, 2000, 2001, and 2002.[22] For completeness, we next briefly discuss petitioner's remaining arguments.

## III. *Petitioner's Remaining Arguments*

### A. *Whether Respondent Ignored Taxable Periods*

Petitioner argues respondent is ignoring the taxable periods for which the deductions were claimed and is impermissibly matching capital loss carryforwards claimed for years not before the Court with environmental remediation expense deductions claimed for years before the Court. Petitioner states that the capital loss carryforwards of $18,347,205 claimed for closed years correspond to $16,699,198 of environmental remediation expense deductions claimed for closed years and that capital loss deductions of $10,727,802 claimed for open years and conceded by petitioner correspond to $11,109,962 of environmental expense deductions claimed for open years. Petitioner believes that because it conceded the capital loss carryforwards claimed for years before the Court, "there is no 'first tax benefit' in the years at issue and therefore, there can be no 'double tax benefit' in the years at issue."

Again, we disagree with petitioner. As of September 1996 the contingent environmental remediation liabilities associated with the Golden West Refinery property totaled $29,070,000. By engaging in the environmental remediation strategy, petitioner essentially accelerated the deductions attributable to payment of the environmental remediation liabilities. The capital loss was realized in a single year— 1996. The second deduction was claimed for the years in which the actual remediation cleanup expenses were paid.

---

[22] We are mindful of the result we have reached. For years closed by the statute of limitations, petitioner claimed capital loss deductions of $18,347,205 and environmental remediation expense deductions of $16,699,198 for total deductions of $35,046,403 for the cleanup of the Golden West Refinery property. Then for years not closed by the statute of limitations, petitioner claimed capital loss deductions of $10,727,595 and environmental remediation expense deductions of $11,109,962. Petitioner conceded the capital loss deductions, and we have disallowed the environmental remediation expense deductions. In effect, petitioner was allowed both capital loss and environmental remediation expense deductions for closed years and then was not allowed deductions for both for open years. We believe this result is in line with the Supreme Court's pronouncement that double deductions (or their practical equivalent) for the same economic loss are impermissible absent a clear declaration of congressional intent. *Charles Ilfeld Co. v. Hernandez*, 292 U.S. 62, 68 (1934); *see also Marwais Steel Co. v. Commissioner*, 354 F.2d at 998–999.

Both deductions arose from the same economic loss, which is the cleanup of the Golden West Refinery property. To the extent of the first deduction, petitioner is not entitled to a second deduction for the same economic loss.

Petitioner argues that "[i]t is clear that Petitioner is not receiving a 'double tax benefit' in the years before Court and, in fact, Respondent is seeking a double *disallowance* of Petitioner's 'tax benefits' in the years at issue". We still disagree. What is in fact clear to this Court is that if we grant petitioner's request and sustain the claimed $11,109,962 in environmental remediation expense deductions, petitioner in total will have claimed $46,156,365 in tax deductions for an economic event that was estimated to cost $29,070,000 and has, at least to date, incurred $27,759,160 of actual cost.[23]

B. *Whether the First Deduction Was Erroneous and Therefore Charles Ilfeld Co. Is Inapplicable*

Petitioner argues that *Charles Ilfeld Co.* is inapplicable because it is limited to situations where the taxpayer correctly treated an item for an earlier barred year. According to petitioner, since the capital loss deductions claimed for closed years were improper, *Charles Ilfeld Co.* is inapplicable. Petitioner places great emphasis on *B.C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516, 521–522 (1972).

In *B.C. Cook & Sons* we stated: "The prohibition against double deductions evolved in the context of cases where the taxpayer *correctly* treated an item in an earlier barred year and received a tax benefit therefrom and then sought to obtain a similar tax benefit in a later year." *Id.* at 521. We went on to state:

If we were to apply the doctrine prohibiting double deductions in a situation such as this, where the petitioner's action in earlier years was *erroneous*, we would turn that doctrine into a sword to pierce the shield of repose provided by the statute of limitations, and there would appear to be little need for the mitigation provisions applicable to double deductions contained in sections 1311–1315 * * *. * * * Moreover, a deduction which is *incorrectly* taken in one year should be corrected by eliminating it from the year in which it was taken. * * * [*Id.*]

---

[23] This $46,156,365 is the sum of (1) $18,347,205 of capital loss deductions claimed for years not before the Court; (2) $16,699,198 of environmental remediation expense deductions claimed for years not before the Court; and (3) $11,109,962 in environmental remediation expense deductions claimed for years before the Court (and at issue in this case).

While we acknowledge the holding in *B.C. Cook & Sons* supports petitioner, we also recognize that the precedential value of the decision has been questioned. *See Alling v. Commissioner*, 102 T.C. 323, 333 (1994), *aff'd without published opinion sub nom. Handelman v. Commissioner*, 57 F.3d 1063 (2d Cir. 1995), *and aff'd without published opinion sub nom. Eisenman v. Commissioner*, 67 F.3d 291 (3d Cir. 1995).

Regardless of our holding in *B.C. Cook & Sons*, the Court of Appeals for the Ninth Circuit has stated: "The applicable principle here is that 'when a taxpayer receives a tax advantage from an erroneous deduction, he may not deduct the same amount in a subsequent year after the Commissioner is barred from adjusting the tax for the prior year." *Stewart*, 739 F.2d at 415 (citing *Robinson v. Commissioner*, 181 F.2d at 18).[24] Accordingly, we conclude that, as we are bound by Ninth Circuit precedent, the fact that the capital loss deductions claimed for earlier years may have been erroneous is immaterial.[25] *See Golsen v. Commissioner*, 54 T.C. 742.

---

[24] We find further support for the Court of Appeals for the Ninth Circuit's not placing emphasis on whether the original deduction was improper in *Unvert v. Commissioner*, 656 F.2d 483 (9th Cir. 1981), *aff'g* 72 T.C. 807 (1979). The taxpayers in *Unvert* concluded they had erroneously claimed a $54,500 deduction for prepaid interest on their 1969 Federal income tax return. *Id.* at 484. In 1972 the taxpayers were refunded the $54,500 they had paid. *Id.* The Internal Revenue Service argued that the $54,500 was taxable income to the taxpayers in 1972 under the tax benefit rule. *Id.* The taxpayers argued that the tax benefit rule was inapplicable on the basis of cases which have held that the rule did not apply when the original deduction was improper. *Id.* at 485. This Court held for the Internal Revenue Service on the basis that the taxpayers were estopped from contending their 1969 deductions improper. *Id.* The Court of Appeals affirmed, but for a different reason. It stated:

Because we affirm on the basis that the erroneous deduction exception should be rejected, we do not consider the Tax Court's estoppel theory.

The logic of the erroneous deduction exception is that an improper deduction should be corrected by assessing a deficiency before the statute of limitations has run, not by treating recovery of the expenditure as income. This rationale was explained most comprehensively in *Canelo*:

"We realize that petitioners herein have received a windfall through the improper deductions. But the statue of limitations requires eventual repose. * * * Here the deduction was improper, and respondent should have challenged it before the years prior to 1960 were closed by the statute of limitations." * * * [*Canelo v. Commissioner*, 53 T.C. 217, 226–227 (1969), *aff'd*, 447 F.2d 484 (9th Cir. 1971).].

We find this unpersuasive. * * *

[*Id.* (fn. ref. omitted).]

The Court of Appeals went on to state that "[t]he erroneous deduction exception is also poor public policy. * * * [and] improperly taken tax deductions should not be rewarded." *Id.* at 486.

[25] In *B.C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516 (1972), we stated that the earlier deduction the taxpayer claimed was "erroneous". In the case at hand, while petitioner has conceded the capital loss and states that "its capital loss carry-forwards should have been disallowed", petitioner also states:

Continued

As previously noted, other courts have also held that whether the first deduction was erroneous is immaterial. *See Robinson v. Commissioner*, 181 F.2d at 18; *Comar Oil Co. v. Helvering*, 107 F.2d 709, 711 (8th Cir. 1939) (holding that whether the original claimed deductions were correctly allowed was immaterial and the first deductions "were allowed with * * * [the taxpayer's] approval and by its inducement, if not its direct request. Under these circumstances it can not complain because it is not allowed a second deduction for the same losses after the bar of the statute has run against a correction of the error made in 1926."); *Stoecklin v. Commissioner*, T.C. Memo. 1987–453 (citing *Robinson*), *aff'd*, 865 F.2d 1221 (11th Cir. 1989); *see also Cincinnati Milling Mac. Co. v. United States*, 83 Ct. Cl. 392 (1936).

IV. *Conclusion*

For the reasons discussed above, petitioner is not entitled to environmental remediation expense deductions claimed for TYE September 30, 2000, 2001, and 2002, of $3,109,962, $4,108,429, and $3,891,571, respectively. The Court has considered all of petitioner's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

———————

Petitioner conceded this issue years after it entered into the transaction which produced the capital loss carry-forward, after courts found that similar transactions lacked economic substance, and thus the capital loss was not properly deductible. While Petitioner believed its transaction did have economic substance when it engaged in the transaction, Petitioner determined that the risk and cost of litigation given the subsequent development of the case law did not justify further litigation of the matter. * * *

These seemingly conflicting statements lead us to question whether petitioner is conceding that the capital loss was erroneous or whether petitioner conceded the capital loss issue simply because it foresaw a probable litigation defeat. Even if the former is correct, there are and will be cases where whether the first deduction was erroneous is at issue. The Court of Appeals for the Ninth Circuit recognized this problem and concluded that "[i]f the erroneous deduction exception is retained in any form, there always will be inquiry as to whether the original deduction was erroneous. In this sense, the erroneous deduction exception actually undermines the policies of the statute of limitations." *Unvert v. Commissioner*, 656 F.2d at 483, 486 n.2.