T.C. Memo. 2013-216

UNITED STATES TAX COURT

DUQUESNE LIGHT HOLDINGS, INC. & SUBSIDIARIES f.k.a.
DQE, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9624-10.                    Filed September 11, 2013.

Miriam L. Fisher and Gary B. Wilcox, for petitioner.

Joseph P. Grant and Donna P. Leone, for respondent.

MEMORANDUM OPINION

CHIECHI, Judge:  This case is before the Court on petitioner's motion for partial summary judgment (petitioner's motion) and respondent's cross-motion for partial summary judgment (respondent's motion).  The Court will deny petitioner's

**[\*2]** motion as set forth below.  The Court will grant respondent's motion as set forth  below.

Background

The record establishes, the parties agree, and/or the parties do not dispute the following.[1]

Petitioner Duquesne Light Holdings, Inc. (Duquesne or petitioner), is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.  Petitioner, by and through its subsidiaries, was in the business of distributing electrical energy to customers throughout certain regions of Pennsylvania.

Duquesne was the common parent of a consolidated group of corporations (Duquesne consolidated return group) that filed a consolidated Federal income tax (tax) return (consolidated return) for each of all relevant years.

AquaSource, Inc. (AquaSource), an indirect, wholly owned subsidiary of Duquesne and a member of the Duquesne consolidated return group, was organized under the laws of the State of Delaware for the purpose of acquiring small and mid-size water, wastewater, and water services companies.  Pursuant to its

---

[1]Unless otherwise indicated, the following discussion pertains to all relevant times.

[*3] business plan, around March 1997 AquaSource began acquiring certain water and wastewater companies that it held in certain of its subsidiaries. During each of the years 1998 and 1999, AquaSource (and certain of its subsidiaries) continued to make significant acquisitions of certain water and wastewater companies. In 2000, after having made four acquisitions of certain water and wastewater companies during that year, AquaSource ceased making such acquisitions.

In 1997, Duquesne began making investments in AquaSource in an effort to diversify Duquesne's business. During that year, DQEnergy Partners, Inc., a subsidiary of Duquesne, contributed to AquaSource $8,308,645 in cash and 1,548,000 shares of Duquesne preferred stock in exchange for 12 shares of AquaSource class A common stock (class A stock).[2]

During 1998, Duquesne (directly or indirectly through DQEnergy Partners, Inc.) contributed to AquaSource $135,553,271 in cash and 33,726,200 shares of Duquesne preferred stock. AquaSource did not issue to Duquesne any additional shares of AquaSource class A common stock with respect to those capital contributions.

---

[2]AquaSource issued a number of shares of class B stock to certain employees and other individuals. That class of stock is not involved in the issues presented in the parties' respective motions.

**[*4]** On October 29, 1998, DQEnergy Partners, Inc., distributed its 12 shares of AquaSource class A stock to Duquesne, thereby terminating DQEnergy Partners, Inc.'s interest in AquaSource and making Duquesne the direct owner of that stock.

During the period April 1, 1997, to February 15, 2001, Duquesne contributed to AquaSource a total of $223,337,687 in cash. On December 11, 1998, AquaSource issued an additional 49,988 shares of class A stock to Duquesne, thereby increasing the total number of outstanding shares of AquaSource class A stock that Duquesne owned from 12 shares to 50,000 shares.[3] Duquesne calculated its basis in the 50,000 shares of AquaSource class A stock that it owned as of December 11, 1998, including the 12 shares of AquaSource class A stock that it had acquired through DQEnergy Partners, Inc., as equal to the total amount (i.e., $223,337,687) of the cash contributions that it made to AquaSource during the period April 1, 1997, to February 15, 2001.

On April 1, 2001, Duquesne contributed to AquaSource $193,533,727 in cash. On November 14, 2001, AquaSource issued 950,000 shares of its class A stock to Duquesne, thereby increasing the total number of outstanding shares of AquaSource class A stock that Duquesne owned from 50,000 shares to 1 million

---

[3]As discussed below, it was not until November 14, 2001, that AquaSource issued any additional shares of its class A stock.

[*5] shares. Duquesne calculated its basis in the 950,000 shares of AquaSource class A stock issued to it on November 14, 2001, as equal to the amount of the cash contribution (i.e., $193,533,727) that it made to AquaSource on April 1, 2001.

Excluding the cash contribution of $193,533,727 that Duquesne made on April 1, 2001, during the period February 16 to December 31, 2001, Duquesne contributed to AquaSource a total of $36,197,000 in cash. On December 21, 2001, AquaSource issued 200,000 shares of its class A stock to Duquesne, thereby increasing the total number of outstanding shares of AquaSource class A stock that Duquesne owned from 1 million shares to 1,200,000 shares. Duquesne calculated its basis in the 200,000 shares of AquaSource class A common stock issued to it on December 21, 2001, as equal to the total amount, excluding the cash contribution of $193,533,727 that it made to AquaSource on April 1, 2001, of the cash contributions (i.e., $36,197,000) that it made to AquaSource during the period February 16, 2001, to December 31, 2001.

Duquesne filed an annual report for 2000 in which it announced that it would be conducting a "comprehensive, market-based strategic and financial review". On the basis of that review, Duquesne decided to refocus its business on

[*6] electrical energy and divest its interests in other types of energy.  As a result,

Duquesne decided to begin selling various assets of AquaSource.[4]

On December 31, 2001, Duquesne transferred to Lehman Brothers Hold-

ings, Inc. (Lehman), the 50,000 shares of AquaSource class A stock that it owned

as of December 11, 1998 (2001 stock transfer), in exchange for an amount equal to

$4 million that was payable in certain services which Lehman had already pro-

vided and was to provide to Duquesne on or before April 14, 2002.  Duquesne

claimed a capital loss of $202,402,100 on that transfer of AquaSource stock,

which it calculated under section 1001[5] as equal to the excess of its claimed

adjusted basis in that stock over the claimed amount realized.  Duquesne deducted

that claimed capital loss under section 165[6] in the consolidated return that it filed

for the Duquesne consolidated return group for taxable year 2001.  After certain

adjustments that respondent made and that petitioner does not dispute, petitioner's

---

[4]In 2001, AquaSource sold one of its assets (i.e., one of its subsidiaries) and claimed a capital loss of $16,692,412 as a result of that sale.  That loss is not in question in this case.

[5]All section references are to the Internal Revenue Code in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[6]Sec. 165(a) allows a deduction for any loss sustained during the taxable year.

[*7] claimed capital loss deduction of $202,402,100 was reduced to $199,114,494 (2001 stock loss in question).

On March 18, 2002, petitioner filed Form 1139, Corporate Application for Tentative Refund (Form 1139), in which it carried back from taxable year 2001 $161,640,702 to taxable year 2000, $135,267,183 of which was attributable to the 2001 stock loss in question.[7]  Pursuant to section 6411, respondent paid petitioner a tentative refund of $35,219,997 with respect to Form 1139 that it had filed.

During 2002 and 2003, Duquesne contributed to AquaSource a total of $18,132,000 in cash.  AquaSource did not issue to Duquesne any additional shares of AquaSource class A stock with respect to those capital contributions. Duquesne made no capital contributions to AquaSource after 2003.

In 2002, AquaSource sold three of its direct and two of its indirect subsidiaries.  Duquesne deducted under section 165 claimed capital losses of $59,584,738 (2002 asset losses in question) with respect to those respective sales in the consolidated return that it filed for the Duquesne consolidated return group for taxable year 2002.

---

[7]Petitioner carried back $4,140,672 and $59,706,339 of the 2001 stock loss in question to each of taxable years 1998 and 1999, respectively.

[*8]   On December 23, 2003, petitioner filed Form 1139, in which it carried back from taxable year 2002 $63,349,715 of long-term capital losses to taxable year 2000, $59,584,738 of which was attributable to the 2002 asset losses in question. Pursuant to section 6411, respondent paid petitioner a tentative refund of $12,669,943 with respect to Form 1139 that it had filed.

In an annual report for 2002, Duquesne described AquaSource as a "discontinued operation".  That report stated in pertinent part:

> Pursuant to agreements entered into in 2002 to sell the majority of our investment in AquaSource * * *, as well as our commitment to sell the remaining net assets of AquaSource, th[is] subsidiar[y] ha[s] been reflected as [a] discontinued operation[] in the consolidated financial statements.  Prior year financial statements have been reclassified to conform to the discontinued operations presentation.

> *       *       *       *       *       *       *

> On July 29, 2002, we [Duquesne] entered into an agreement to sell AquaSource's investor-owned water utilities to PSC [Philadelphia Suburban Corporation] for approximately $205 million in cash.  In addition, PSC is acquiring selected operating and maintenance contract operations in seven states that are closely integrated with the investor-owned water utilities being acquired.  The businesses being acquired represent a significant portion of AquaSource's remaining assets.  The final purchase price could vary from $180 to $215 million, as various purchase price adjustments are applied. * * * The closing is expected to occur during the second half of 2003.

In 2003, AquaSource sold all of its remaining assets to unrelated third parties.  Petitioner deducted under section 165 a claimed capital loss totaling

**[*9]** $176,952,975 with respect to those sales in the consolidated return that it filed for the Duquesne consolidated return group for taxable year 2003. After certain adjustments that respondent made and that petitioner does not dispute, the claimed capital loss deduction of $176,952,975 was increased to $192,835,360 (2003 asset losses in question).

On April 23, 2004, petitioner filed Form 1139, in which it carried back from taxable year 2003 $184,874,430 of long-term capital losses to taxable year 2000. Thereafter, on December 23, 2004, petitioner filed a second Form 1139, in which it carried back from taxable year 2003 $16,531,429 of long-term capital losses to taxable year 2000. Thus, a total of $201,405,859 of long-term capital losses was carried back from taxable year 2003 to taxable year 2000, $192,835,360 of which was attributable to the 2003 asset losses in question. Pursuant to section 6411, respondent paid petitioner tentative refunds totaling $40,281,401 with respect to the two Forms 1139 that it had filed.

The period of limitations under section 6501(a), as extended in writing under section 6501(c)(4)(A), during which respondent may assess and collect tax for taxable year 2000 expired on December 31, 2006. The period of limitations under section 6501(a), as extended in writing under section 6501(c)(4)(A), during

[*10] which respondent may assess and collect tax for taxable year 2002 also expired on December 31, 2006. The period of limitations under section 6501(a), as extended in writing under section 6501(c)(4)(A), during which respondent may assess and collect tax for taxable year 2003 would have expired on June 30, 2010, but is suspended under section 6503(a) until 60 days after the decision in the instant case becomes final.

On January 8, 2008, respondent sent to petitioner a so-called 30-day letter with respect to the Duquesne consolidated return group's taxable years 2000, 2003, 2004, and 2005. Respondent attached to that 30-day letter a copy of an examination report (respondent's examination report) that one of respondent's revenue agents (revenue agent) had prepared as a result of that agent's examination of those taxable years. (The Court will sometimes refer collectively to the 30-day letter and respondent's examination report attached thereto as the 30-day letter.) In respondent's examination report, the revenue agent asserted:

> In summary, between 1997 and 2003, * * * [Duquesne] contributed capital of $471,200,414 to AquaSource. There were operating profits in four years: $1,985,576 in 1999; $3,003,334 in 2002; $1,752,752 in 2004; and $1,509,861 in 2005, or total operating profits of $8,251,523. There were operating losses in five years: ($641,240) in 1997; ($140,354) in 1998; ($35,572,514) in 2000; ($4,089,268) in 2001; and ($14,409,389) in 2003, or total operating losses of ($55,032,765).

[*11] In addition to the operating losses, capital losses, after adjustment, were claimed on the 2001 sale of AquaSource stock to Lehman ($199,144,494), as well as on the sale of the assets of AquaSource: ($16,692,412) in 2001; ($57,273,704) in 2002; and ($176,952,975) in 2003. Accordingly, capital losses of ($450,063,585) were claimed in connection with * * * [Duquesne's] investment in AquaSource.

The revenue agent proposed the following determinations in respondent's

examination report:

> When the capital contributed, and profits and losses (operating and capital) are viewed in light of the capital that was returned to * * * [Duquesne] when it shed itself of the water business, it is clear that the tax losses claimed in connection with this investment were excessive in that they greatly exceed the true economic loss incurred by * * * [Duquesne]. * * *
>
> *        *        *        *        *        *        *
>
> Since the consolidated group recognized a loss on the December 31, 2001 disposition of approximately 4% of the AquaSource stock, which loss was attributable to the fact that there was built-in loss in the underlying assets of AquaSource, the consolidated group is not permitted to take the duplicative losses when the underlying assets were sold in 2002 and 2003. Accordingly, the portion of the asset sale losses that are duplicative (determined by application of a ratio consisting of the loss claimed on the stock sale over the potential duplicative loss as of December 31, 2001, against the losses claimed per asset sale) should be disallowed by application of the doctrine of Charles Ilfeld Co. v. Hernandez, 292 U.S. 62 (1934).
>
> *        *        *        *        *        *        *
>
> * * * [T]here is a possibility of a duplicated loss anytime stock in the subsidiary is disposed of prior to disposition of the assets held by the subsidiary and the assets have built-in loss. This is because the value

[*12] of the stock in the subsidiary is based upon the value of the underlying assets. If the stock is sold, generating a loss, and then the assets with built-in loss are sold, generating another loss, then the consolidated group gets a double deduction for what is one economic loss. * * *

On February 22, 2008, petitioner's representative filed a protest on petitioner's behalf with respondent's Appeals Office (Appeals Office), in which petitioner protested the proposed determinations in the 30-day letter. Petitioner did not reach a settlement agreement with the Appeals Office with respect to those proposed determinations.

Petitioner's representative sent to the Appeals Office on petitioner's behalf a letter dated August 26, 2009 (August 26, 2009 letter), in which petitioner questioned the reasoning behind certain of respondent's proposed determinations with respect to its 2000 tax liability.

In response to petitioner's August 26, 2009 letter, counsel for respondent sent to petitioner's representative a letter dated October 27, 2009. In that letter, that counsel stated:

> [Duquesne] claimed refunds (via Forms 1139) for the year 2000 by carrying the capital losses from 2001, 2002 and 2003 back to that year (on separate Forms 1139 for each year). Upon examination, the Service did not disallow the 2001 or 2002 losses, but did disallow the 2003 losses. Exam also proposed, in the alternative, to adjust DLH [Duquesne]'s 2005 year to force DLH to recognize its Excess Loss Account (ELA), which was largely attributable to the $199,114,494

[*13] duplicated loss. The matter was not settled in Appeals, so that the proposed SND [statutory notice of deficiency] reflected the disallowance of the 2003 loss and the ELA adjustment for 2005. * * *

In the course [of] its review of the 2003 [asset] loss disallowance, it was necessary for Counsel to review the facts of the original 2001 loss, since those facts were relevant to the application of the Ilfeld doctrine[3] under which the 2003 loss carryback had been disallowed. Counsel determined that, under a number of legal and factual theories, the 2001 [stock] loss [in question] was not allowable. Counsel recommended disallowance of the carryback of the 2001 loss as an alternative ground in support of the adjustment for the year 2000, i.e., as an offset to DLH's refund claim for the year 2000. Counsel also recommended that 2002 [asset] losses [in question] claimed with respect to AS [AquaSource] asset sales (also carried back to the year 2000 via a Form 1139 refund claim) be disallowed under the Ilfeld doctrine.

[3]See Charles Ilfeld Co. v. Hernandez, 292 U.S. 62 (1934). The Ilfeld doctrine, where applicable, precludes multiple recognition of the same economic loss. The application of the doctrine is on a facts and circumstances basis.

On January 27, 2010, respondent issued to petitioner a notice of deficiency (notice) for taxable years 2000 and 2005. In that notice, respondent determined a deficiency of $36,996,999 for taxable year 2000. In that notice, respondent further determined, for alternative reasons, to disallow the carryback to taxable year 2000 of a total of $199,114,494 of claimed long-term capital losses. Respondent set forth in the notice the following principal reasons for those determinations:

**[\*14]** <u>Item 7d--Long Term Capital Loss Carryback--2000</u>

1.  It has been determined that the capital loss in the amount of $199,114,194 claimed in connection with Duquesne Light Holdings Inc. & Subsidiaries' (DLH's) transfer of shares of AquaSource to Lehman Brothers (Lehman) in 2001, and carried back to the years 1998, 1999 and 2000 in the amounts of $4,140,672, $59,706,339 and $135,267,183\*, respectively, is disallowed for the alternative reasons explained below:

> \* The disallowance of amounts carried back from 2001 to 1998 and 1999 has the effect of reallocating capital loss carrybacks from 2002 to 1998 and 1999 which, in turn, results in a decreased capital loss carryback from 2002 to 2000.  The net effect of the capital loss carry- back disallowance and reallocation is to increase capital gain for the year 2000 by $199,114,494, as shown in pages 13 and 14.

The transfer of AquaSource stock to Lehman was made in order to increase the value of DLH's remaining AquaSource stock and consti- tutes a capital expenditure under I.R.C. Section 263, therefore, no loss was incurred under Section 165.  The cost basis of the transferred stock in excess of the amount considered received for the transferred stock must be allocated to the remaining AquaSource stock held by DLH.

The transfer of AquaSource stock to Lehman was property transferred in consideration of services provided to AquaSource.  Consequently, pursuant to Treas. Reg. Sections 1.83-6(d) and 1.032-3, the transfer of stock is considered to be a contribution of stock by DLH to AquaSource, followed by the transfer of the stock by AquaSource to Lehman.

The substance of the transaction was to compensate Lehman for its service to AquaSource with stock representing a 4.1667% interest in AquaSource.  The form of the transaction involved interrelated steps, purportedly producing a disproportionate capital loss, which may not

[*15] be considered independently of that overall transaction. In addition, the transaction lacked economic substance.

> The issuances of stock by AquaSource to DLH on November 13, 2001 and December 21, 2001 (the new shares) were not made in connection with capital contributions, but rather, were stock dividends. Pursuant to I.R.C. Section 307(a), DLH's basis in its shares of AquaSource stock is allocated pro-rata among the old and new shares. Consequently, if it is determined that a loss is allowable in connection with the transfer of AquaSource shares to Lehman, then the amount of that loss is computed as 4.1667% (50,000/1,200,000) of DLH's basis in all of its AquaSource stock, less the amount considered received by DLH for the stock pursuant to I.R.C. Section 83.

Respondent set forth in the notice under the heading "Long Term Capital Loss Carryback--2000" the following alternative reason (respondent's alternative determinations) for disallowing the carryback to taxable year 2000 of a total of $199,114,494 of claimed long-term capital losses:

> 2. Alternatively, if loss recognition in connection with the 2001 transfer of AquaSource stock to Lehman is allowed, losses claimed in connection with the sale of AquaSource assets (asset losses) in 2002 and 2003 are disallowed, as those losses duplicate the economic loss claimed in connection with the 2001 transfer of AquaSource stock. Consequently, losses claimed in 2002 and 2003 in the amounts of $48,682,648 and $150,431,846, respectively, and carried back to the year 2000, are disallowed * * *.[8]

---

[8]Respondent did not explain in the notice the methodology that respondent used to determine to disallow the respective deductions for taxable years 2002 and 2003 and the respective carrybacks to taxable year 2000 (1) from taxable year 2002 of only $48,682,648 of the $59,584,738 of 2002 asset losses in question and (2) from taxable year 2003 of only $150,431,846 of the $192,835,360 of 2003

(continued...)

[*16] Respondent also made the following determination in the notice to include in petitioner's income for taxable year 2005 the excess loss account of AquaSource totaling $228,121,320 (excess loss account determination):

> Item 7e--Excess Loss Account--2005
> It is determined that the excess loss account in AquaSource in the amount of $228,121,320 is includable in income in 2005 . Please note, however, that some of the other adjustments determined herein, if sustained or agreed, would have the effect of reducing the excess loss account and, in turn, would reduce the amount of this adjustment.

While the Court was considering the various issues presented in petitioner's motion and the only issue presented in respondent's motion, including the issues presented in those motions relating to respondent's alternative determinations, the Court was considering an issue (duplicate deductions issue) in another case, Thrifty Oil Co. v. Commissioner, docket No. 1376-10, that involved what the Commissioner of Internal Revenue (Commissioner) alleged were certain deductions that the taxpayer claimed for different taxable years and that represented the same economic losses of the taxpayer (duplicate or double deductions). The Commissioner was arguing in Thrifty Oil Co. that Charles Ilfeld Co. v. Hernandez, 292 U.S. 62 (1934), controlled the resolution of that issue. Respondent advances

---

[8](...continued)
asset losses in question. Respondent did, however, explain that methodology in the 30-day letter.

[*17] the same argument in the instant case with respect to certain deductions that petitioner claimed for different taxable years and that respondent alleges represent the same economic losses of petitioner.

In recognition of the potential precedential effect of the resolution of the duplicate deductions issue in Thrifty Oil Co. on the resolution of the duplicate deductions issue in the instant case, Duquesne filed a motion for leave to file a brief amicus curiae in the Thrifty Oil Co. case (Duquesne's amicus brief), which the Court granted. In that motion, Duquesne described the duplicate deductions issue presented in Thrifty Oil Co., which involved "taxpayers who must comply with the consolidated return regulations", as the "same" as the duplicate deductions issue presented in the instant case, which also involves "taxpayers who must comply with the consolidated return regulations".

The Court filed its Opinion in Thrifty Oil Co. v. Commissioner, 139 T.C. 198 (2012), and, as discussed in detail below, concluded that under the Court's caselaw and caselaw of the U.S. Court of Appeals for the Ninth Circuit (Court of Appeals for the Ninth Circuit), the court to which an appeal in Thrifty Oil Co. would normally lie, Charles Ilfeld Co. controlled resolution of the duplicate deductions issue presented in Thrifty Oil Co. The Court held there that the taxpayer was not entitled to certain deductions for the taxable years at issue that

[*18] represented or duplicated deductions for the same economic losses that the taxpayer had previously taken for certain other taxable years.

On the same date on which the Court issued its Opinion in Thrifty Oil Co., the Court issued an order in the instant case. In that order, the Court ordered the parties to file respective responses to that order explaining why Thrifty Oil Co. should or should not control resolution of the duplicate deductions issue presented in petitioner's motion and respondent's motion. Petitioner and respondent filed their respective responses (petitioner's response to the Court's order and respondent's response to the Court's order, respectively).

Discussion

The Court may grant summary judgment where there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of proving that there is no genuine dispute of material fact, and factual inferences will be read in a manner most favorable to the nonmoving party. See Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982).

In petitioner's motion, petitioner requests the Court to grant summary adjudication in its favor on several issues. Petitioner initially asks the Court for

[*19] summary adjudication in its favor with respect to the duplicate deductions issue raised in respondent's alternative determinations that petitioner is not entitled to deduct for taxable year 2003 and carry back to taxable year 2000 $150,431,846 of the $192,835,360 of 2003 asset losses in question.[9]  In support of that request,  petitioner argues that neither <u>Charles Ilfeld Co. v. Hernandez</u>, 292 U.S. 62, nor <u>Thrifty Oil Co. v. Commissioner</u>, 139 T.C. 198, which relied on <u>Charles Ilfeld Co.</u> and caselaw of the Court of Appeals for the Ninth Circuit, controls resolution of respondent's alternative determinations.  According to petitioner, "the result sought by Respondent [in respondent's alternative determinations] could only be obtained by issuing regulations".

In respondent's motion, respondent asks the Court to grant summary adjudication in respondent's favor with respect to the duplicate deductions issue raised in respondent's alternative determinations that petitioner is not entitled to deduct for 2002 and 2003, respectively, and carry back to taxable year 2000 $48,682,648 of the $59,584,738 of 2002 asset losses in question and $150,431,846

---

[9]Petitioner does not address in detail in petitioner's motion respondent's alternative determinations that petitioner is not entitled to deduct for taxable year 2002 and carry back to taxable year 2000 $48,682,648 of the $59,584,738 of 2002 asset losses in question.  Although petitioner does not address those alternative determinations, the Court does.

[*20] of the $192,835,360 of 2003 asset losses in question.[10]  In support of that

request, respondent argues that both <u>Charles Ilfeld Co.</u> and <u>Thrifty Oil Co.</u>, which

relied on <u>Charles Ilfeld Co.</u>, control resolution of respondent's alternative determi-

nations.  According to respondent:

> <u>Ilfeld</u> continued to be a vital canon of statutory construction in tax
> law generally, and, more specifically, the <u>Woods Investment</u> [<u>Co. v.
> Commissioner</u>, 85 T.C. 274 (1985)] line of cases established that the
> <u>Ilfeld</u> doctrine continues to be a vital canon of statutory construction
> in the consolidated return area--even well after the implementation of
> former § 1.1502-32 [Income Tax Regs.] (which in fact would have
> prevented any duplication of loss under the specific facts of <u>Ilfeld</u>
> * * *).

(The Court will sometimes refer to the duplicate deductions issue raised in respon-

dent's alternative determinations and presented in both petitioner's motion and

respondent's motion as the <u>Ilfeld</u> issue.)

In the event the Court were to sustain respondent's alternative determina-

tions, petitioner asks the Court in petitioner's motion to conclude that under

section 6501 respondent is not permitted to assess and collect a deficiency

---

[10]Respondent represents in certain filings that respondent made with respect
to the parties' respective motions that if the Court were to grant respondent's
motion and sustain the disallowance of the respective deductions for taxable years
2002 and 2003 and the respective carrybacks to taxable year 2000 of a total of
$199,114,494 of the 2002 asset losses in question and the 2003 asset losses in
question, respondent would concede (1) the determinations in the notice relating to
the 2001 stock loss in question and (2) the excess loss account determination.

[*21] for taxable year 2000--a year with respect to which the parties agree the period of limitations under section 6501(a) and (c)(4)(A) has expired--that is attributable to the carryback to that year from taxable year 2002--a year with respect to which the parties agree the period of limitations under section 6501(a) and (c)(4)(A) has expired--of $48,682,648 of the $59,584,738 of 2002 asset losses in question.[11] (The Court will refer to the issue relating to section 6501 presented in petitioner's motion as the statute of limitations issue.)

Ilfeld Issue

In Charles Ilfeld Co., the Supreme Court of the United States (Supreme Court) considered whether the taxpayer, the parent of a group of companies that filed consolidated returns, was entitled to deduct for the taxable year at issue certain losses that had arisen in connection with the dissolution of two of its subsidiaries where, from an economic standpoint, the taxpayer, as the parent of that consolidated group, had deducted those same losses as operating losses of those subsidiaries for certain taxable years that preceded the taxable year at issue. The Supreme Court held that the taxpayer was not entitled to those claimed

---

[11]Petitioner asks the Court in petitioner's motion to grant summary adjudication in its favor on several other issues. The Court's holdings herein and certain concessions of respondent, see supra note 10, have made those other issues moot, and the Court will not consider them and will deny petitioner's motion with respect to them.

[*22] deductions for the taxable year at issue.  The Supreme Court gave the

following reasons for so holding:

> The allowance claimed [by the taxpayer] would permit * * * [the
> taxpayer] twice to use the [taxpayer's] subsidiaries' losses for the
> reduction of its taxable income.  By means of the consolidated returns
> in earlier years it was enabled to deduct them.  And now it claims for
> 1929 deductions for diminution of assets resulting from the same
> losses.  If allowed, this would be the practical equivalent of double
> deduction.  In the absence of a provision of the * * * [Revenue Act of
> 1928] definitely requiring it, a purpose so opposed to precedent and
> equality of treatment of taxpayers will not be attributed to lawmakers.
> * * * There is nothing in the * * * [Revenue Act of 1928] that pur-
> ports to authorize double deduction of losses or in the regulations to
> suggest that the commissioner construed any of its provisions to
> empower him to prescribe a regulation that would permit consoli-
> dated returns to be made on the basis now claimed by * * * [the
> taxpayer].

Charles Ilfeld Co. v. Hernandez, 292 U.S. at 68.

In Thrifty Oil Co., the Court considered whether the taxpayer, the parent of

a group of corporations that filed consolidated returns (Thrifty consolidated return

group), was entitled to deductions for the taxable years at issue for certain envi-

ronmental remediation expenses if, as the Commissioner claimed, those deduc-

tions, from an economic standpoint, duplicated deductions for certain capital

losses that the taxpayer had taken for taxable years which were not before the

Court and with respect to which the respective periods of limitations under section

6501 had expired.  Thrifty Oil Co. v. Commissioner, 139 T.C. at 198.  The Court

**[\*23]** found that the environmental remediation expense deductions at issue in Thrifty Oil Co. and the capital loss deductions in question represented the same economic loss. Id. at 212. The Court held that under Charles Ilfeld Co. and caselaw of the Court of Appeals for the Ninth Circuit the taxpayer was not entitled for the taxable years at issue to deductions for certain environmental remediation expenses. Id. at 218. Because it will be helpful in understanding the import of both Charles Ilfeld Co. and Thrifty Oil Co. to the Court's resolution of the parties' dispute in the instant case with respect to the Ilfeld issue raised in respondent's alternative determinations, the Court will describe in detail the facts and the analyses in Thrifty Oil Co. on which the Court based that finding and that holding.

In Thrifty Oil Co., the taxpayer, through one of its subsidiaries, acquired certain property on which an oil refinery was located (refinery property). Thrifty Oil Co. v. Commissioner, 139 T.C. at 199. Because of certain refinery operations, that property suffered certain environmental contamination, and the taxpayer and the subsidiary were responsible for remediation of the refinery property. Id. As of September 1996, the contingent environmental remediation liabilities with respect to the refinery property totaled $29,070,000. Id. at 200.

In 1996, pursuant to a so-called environmental remediation strategy, one of the taxpayer's subsidiaries sold certain stock and claimed a capital loss of

[*24] $29,074,800 (1996 capital loss) with respect to that sale in the Thrifty consolidated return group return that the taxpayer filed for taxable year ended September 30, 1996.[12] Id. at 202. The taxpayer deducted approximately $2.8 million of that capital loss for that taxable year and carried forward the remainder of that loss to, and claimed capital loss deductions of $5,348,310, $3,755,873, and $6,360,553 for, the following three taxable years: taxable years ended September 30, 1997, 1998, and 1999, respectively. Id. n.7. Thereafter, the taxpayer claimed deductions for the remaining $10,727,595 of the 1996 capital loss for taxable years ended September 30, 2000 and 2001. Id. at 202.

During 1996 and certain years thereafter, another of the taxpayer's subsidiaries made certain expenditures for the remediation of the refinery property (environmental remediation expenses). Id. The taxpayer provided the funds used to pay those expenses. Id. The taxpayer claimed deductions of $339,435,

---

[12]In September 1996, the owner of the refinery property entered into a sec. 351 transaction with another of Thrifty's subsidiaries. Thrifty Oil Co. v. Commissioner, 139 T.C. 198, 200 (2012). In exchange for 90 shares of the latter subsidiary's stock, the owner of the refinery property transferred to that subsidiary a promissory note with a face value and claimed fair market value of $29,100,000. Id. In addition, that latter subsidiary assumed the contingent environmental remediation liabilities of $29,070,000 relating to the refinery property. Id. at 201. The subsidiary claimed a basis in the acquired shares equal to the face value of the promissory note, without adjusting for the assumed contingent environmental remediation liabilities. Id.

**[\*25]** $1,854,405, and $14,505,358 for taxable years ended September 30, 1997, 1998, and 1999, respectively, for its payment of certain environmental remediation expenses. Thrifty Oil Co. v. Commissioner, 139 T.C. at 202-203. Thereafter, the taxpayer claimed deductions of $3,109,962, $4,108,429, and $3,891,571 for taxable years ended September 30, 2000, 2001, and 2002, respectively, for its payment of certain environmental remediation expenses. Id. at 203.

In a notice of deficiency (Thrifty Oil notice), the Commissioner determined to disallow capital loss carryover deductions of $1,426,576 and $9,301,019 for taxable years ended September 30, 2000 and 2001, respectively, and environmental remediation expense deductions of $4,370,802, $4,108,429, and $3,891,571 for taxable years ended September 30, 2000, 2001, and 2002.[13] Id. In support of those determinations, the Commissioner further determined that those capital loss carryover deductions and those environmental remediation expense deductions "duplicate tax benefits already claimed for a single economic loss." Id.

After certain stipulations and certain concessions, the sole issue before the Court in Thrifty Oil Co. was whether the taxpayer was entitled to the environmen-

---

[13]The respective periods of limitations under sec. 6501 had not expired for taxable years ended September 30, 2000, 2001, and 2002, at the time the Commissioner issued the Thrifty Oil notice. The respective periods of limitations under sec. 6501 for taxable years ended September 30, 1996, 1997, 1998, and 1999, had expired at that time. Thrifty Oil Co. v. Commissioner, 139 T.C. at 202.

**[\*26]** tal remediation expense deductions that it claimed for taxable years ended September 30, 2000, 2001, and 2002. Id. at 204. The Commissioner's only argument in support of his position that the taxpayer was not entitled to those claimed deductions was that they "duplicate $18,347,205 in capital loss deductions * * * [the taxpayer] claimed for years not before the Court, and hence * * * [the taxpayer] is not entitled to up to $18,347,205 of the claimed environmental remediation expense deductions." Id. at 204-205.

After examining caselaw of this Court and the Court of Appeals for the Ninth Circuit, this Court concluded that "[t]he Court of Appeals for the Ninth Circuit, like the Tax Court, follows the *Ilfeld* doctrine." Id. at 212 (emphasis added). It is significant for purposes of the instant case that the Court came to that conclusion in Thrifty Oil Co. after having examined several of the cases, e.g., Woods Inv. Co. v. Commissioner, 85 T.C. 274 (1985), Wyman-Gordon Co. & Rome Indus. Inc. v. Commissioner, 89 T.C. 207 (1987), CSI Hydrostatic Testers, Inc. v. Commissioner, 103 T.C. 398 (1994), aff'd, 62 F.3d 136 (5th Cir. 1995), on which Duquesne relies as petitioner in the instant case, and relied as amicus in Thrifty Oil Co., to support its position that the Court does not follow the interpretation of Charles Ilfeld Co. that respondent advances in the instant case, and advanced in Thrifty Oil Co. In Thrifty Oil Co., the Court analyzed those cases in

**[\*27]** order to explain how the Court previously "has applied the Supreme Court's pronouncement of the Ilfeld doctrine". Thrifty Oil Co. v. Commissioner, 139 T.C. at 206. The Court concluded on the basis of that analysis that "[i]f the deductions represent the same economic loss to petitioner and petitioner cannot point to a specific provision demonstrating Congress' intent to allow the double deductions, then the claimed environmental remediation expense deductions must be disallowed." Id. at 212.

In an attempt to avoid the application of the holding in Charles Ilfeld Co. to the duplicate deductions issue in Thrifty Oil Co., the taxpayer argued in Thrifty Oil Co. (1) that the capital loss deductions that it claimed for taxable years before the taxable years at issue and the environmental remediation expense deductions that it claimed for the years at issue did not represent the same economic loss (no double deduction argument) and (2) that it could point to a specific provision, i.e., section 162, demonstrating the intention of Congress to allow the double deductions (specific provision argument). See id. at 212, 214. The Court rejected both of those arguments. See id.

In rejecting the taxpayer's no double deduction argument in Thrifty Oil Co., the Court found:

**[\*28]** Both the capital loss and the environmental remediation expense deductions represent costs associated with the cleanup of the \* \* \* [refinery property]. The capital loss represents the unpaid liability, and the environmental remediation expense deductions represent the actual cost when paid. This--deducting the unpaid liability in the form of a capital loss and then deducting it again when paid--is the core problem of this case. \* \* \*

Id. at 212.

In rejecting the taxpayer's specific provision argument in Thrifty Oil Co., the Court concluded that section 162 is a "general allowance provision" which "does not reflect a 'clear declaration of intent' to allow a double deduction." Id. at 214 (quoting Brenner v. Commissioner, 62 T.C. 878, 884-885 (1974)).

In petitioner's response to the Court's order in the instant case ordering the parties to file respective responses to that order, in which they were to explain why Thrifty Oil Co. should or should not control resolution of the Ilfeld issue presented in the petitioner's motion and respondent's motion, petitioner maintains that Thrifty Oil Co. should not control the outcome of the instant case because (1) in Thrifty Oil Co. the Court followed certain caselaw of the Court of Appeals for the Ninth Circuit, including Marwais Steel Co. v. Commissioner, 354 F.2d 997 (9th Cir. 1965), aff'g 38 T.C. 633 (1962), that interpreted and applied Charles Ilfeld Co. in a certain way, and (2) the U.S. Court of Appeals for the Third Circuit (Court of Appeals for the Third Circuit), the court to which an appeal in the instant

**[*29]** case would normally lie, has interpreted and applied <u>Charles Ilfeld Co.</u> in a manner that is different from the way in which the Court of Appeals for the Ninth Circuit has interpreted and applied that case.

The Court turns first to petitioner's argument about <u>Marwais Steel Co.</u> According to petitioner:

> In <u>Marwais</u>, the Ninth Circuit interpreted what it conceded was *dicta* in <u>Ilfeld</u> as an overriding principle that takes precedence over the plain meaning of the Code.  <u>Marwais</u>, 354 F.2d at 998-99.[5]  Interpreting <u>Marwais</u>, <u>Thrifty Oil</u> stated that the so-called Ilfeld doctrine prevents a double tax benefit unless the words of a specific provision show congressional intent to allow the double benefit.  Slip op. at 25. * * *
>
> * * * In using <u>Ilfeld</u> to override the plain meaning of section 162 without examining either the law's intent or the intent of the legislative regulations governing consolidated groups, <u>Thrifty Oil</u> is firmly aligned with Ninth Circuit precedent.  As such, <u>Thrifty Oil</u> should not govern the outcome of this case.  Rather, petitioner should prevail under the Third Circuit's approach.
>
> [5]The Ninth Circuit recognized that "part of what was there said [in <u>Ilfeld</u>] was dicta," but stated that "it is dicta the court will follow in cases having any similarity at all on double deductions for a single economic loss."  <u>Marwais</u>, 354 F.2d at 998-99.

Petitioner misconstrues both what the Court of Appeals for the Ninth Circuit said in <u>Marwais Steel Co.</u> with respect to the application of <u>Charles Ilfeld Co.</u> in that court and what this Court said in <u>Thrifty Oil Co.</u> about the import of what that Court of Appeals said on this Court's resolution of the duplicate deductions issue

**[\*30]** presented in Thrifty Oil Co. In Marwais Steel Co., the Court of Appeals for the Ninth Circuit stated:

> We conclude, as the tax court did, plausible as the position of Marwais is, there is a message in Ilfeld Co. * * *, another double tax deduction disallowed. We follow taxpayer's argument that part of what was there said was dicta. * * * If what it said there was dicta, we believe that it is dicta the court will follow in cases having any similarity at all on double deductions for a single economic loss. [Fn. ref. omitted.]

Marwais Steel Co. v. Commissioner, 354 F.2d at 998-999.

In Thrifty Oil Co., the Court construed the above-quoted excerpt from Marwais as meaning just what it says and nothing more: "The Court of Appeals for the Ninth Circuit, like the Tax Court, follows the *Ilfeld* doctrine." Thrifty Oil Co. v. Commissioner, 139 T.C. at 212. Contrary to petitioner's argument, the Court of Appeals for the Ninth Circuit said nothing more about Charles Ilfeld Co. that influenced the Court's resolution of the duplicate deductions issue in Thrifty Oil Co.[14]

---

[14]In Thrifty Oil Co. v. Commissioner, 139 T.C. at 210 n.18, the Court addressed the following argument in Duquesne's amicus brief: "'The First Circuit Court of Appeals * * * reached the opposite conclusion on facts very similar to *Marwais*.' See Textron, Inc. v. United States, 561 F.2d 1023 (1st Cir. 1977)." The Court gave the following response to that argument: "Even if true, this case [Thrifty Oil Co.] is not appealable in the First Circuit. We also note *Textron* dealt with a parent and a subsidiary that did not file a consolidated return, a point which was carefully noted by the court in *Textron*. * * * [Thrifty Oil Co.] files

(continued...)

**[*31]** The Court turns now to petitioner's argument that <u>Charles Ilfeld Co.</u> should

not apply in the instant case because, according to petitioner, the Court of Appeals

for the Third Circuit "does not follow the <u>Marwais</u> approach [of the Court of

Appeals for the Ninth Circuit]" in interpreting and applying that Supreme Court

case. In support of that argument, petitioner relies principally on <u>Estate of Miller</u>

<u>v. Commissioner</u>, 400 F.2d 407 (3d Cir. 1968), <u>aff'g</u> 48 T.C. 251 (1967), <u>and rev'g</u>

48 T.C. 265 (1967). In <u>Estate of Miller</u>, the Court of Appeals for the Third Circuit

considered two related decisions on appeal from the Court in cases that involved

the respective estates of a husband and a wife where the wife predeceased her

husband. Her testamentary plan provided that the residue of her estate was to be

held in a trust with the trust corpus to be divided into two shares. <u>Id.</u> at 408. One

share of the trust corpus was to equal 40 percent (40 percent share), and the other

share thereof was to equal 60 percent (60 percent share). <u>Id.</u> The net income of

---

[14](...continued)
consolidated returns, thus distinguishing it from the taxpayer in *Textron*." <u>Id.</u>
Like <u>Thrifty Oil Co.</u>, the instant case is not appealable to the U.S. Court of
Appeals for the First Circuit. In addition, petitioner in the instant case, like the
taxpayer in <u>Thrifty Oil Co.</u>, filed consolidated returns for the taxable years at issue
as the parent of a consolidated return group.

**[\*32]** the 40 percent share was to be distributed to the husband for his life.[15] Id.

The husband had a general testamentary power of appointment over the 40 percent

share, but if he died without exercising that power of appointment, the income

from that share was to be distributed to the couple's son and the remainder was to

be distributed to a charitable corporation. Id. The husband exercised his general

power of appointment in his will and provided that upon his death the income

from the 40 percent share was to be distributed to the couple's son and the remain-

der was to be distributed to a charitable corporation. Id. at 409. The wife's estate

claimed (1) a marital deduction (wife's marital deduction) equal to the value at the

time of her death of the 40 percent share of the trust corpus and (2) a charitable

deduction (wife's charitable contribution deduction) equal to the value at the time

of her death of the remainder of 40 percent of the trust corpus. Id. at 409-410.

After the husband died, the husband's estate claimed a charitable deduction

(husband's charitable contribution deduction) equal to the value at the time of his

death of the remainder of the trust that he had appointed to the charitable corpora-

tion. Id. at 410.

---

[15]The wife's will provided that the net income from the 60 percent share was to be paid to the couple's son for life with the remainder to his issue. Estate of Miller v. Commissioner, 48 T.C. 251, 253 n.2 (1967), aff'd, 400 F.2d 407 (3d Cir. 1968).

**[\*33]** The Court had held in the related cases (1) that the wife's estate was entitled to both the wife's charitable contribution deduction and the wife's marital deduction, <u>Estate of Miller v. Commissioner</u>, 48 T.C. 251, and (2) that the husband's estate was not entitled to the husband's charitable contribution deduction because that deduction was based on the same transfer of the same property to the same charity, which also was the basis of the wife's charitable contribution deduction, <u>Estate of Miller v. Commissioner</u>, 48 T.C. 265.

The Court of Appeals for the Third Circuit reversed the Court's decision in the case that involved the husband's estate and held that that estate was entitled to the husband's charitable contribution deduction. <u>Estate of Miller v. Commissioner</u>, 400 F.2d at 413. In so holding, the Court of Appeals for the Third Circuit described the circumstances under which the courts have applied the <u>Charles Ilfeld Co.</u> case as follows:

> The line of cases cited by the Commissioner descending from <u>Charles Ilfeld Co. v. Hernandez</u>, 292 U.S. 62, 68, 54 S.Ct. 596, 78 L.Ed. 1127 (1934), and allegedly supporting the rule of tax interpretation that double deductions are not permitted absent express statutory mandate, is merely a variation on the "avoid absurd results" rule. In addition, <u>this tax "rule" has rarely been applied outside the peculiar income tax context of consolidated corporate income tax reporting and attempted double deductions of business losses, and it cannot be regarded as a legitimate canon of estate tax interpretation to assist the court in this case</u>. [Emphasis added; fn. refs. omitted.]

[*34] Id. at 411.

In a footnote to the above-quoted text, the Court of Appeals for the Third

Circuit observed:

> The "rule against double deductions" seems particularly unuseful in
> the present case since, with respect to one "doubling," we are pre-
> sented with separate taxpayers seeking deductions and since we
> observe that Congress has acted explicitly on one occasion to prevent
> double deductions arising in an estate tax context.  See § 642(g) with
> reference to §§ 2053 and 2054.  In addition, using broad equitable
> consideration, such as preventing multiple deductions, to solve
> problems raised by a tax statute is a dangerous course, e.g., Budd
> Company v. United States, 252 F.2d 456, 458 (3rd Cir. 1957).  This
> applies to the Commissioner's observation that his position of a
> marital deduction for Edna [the wife] and a charitable deduction for
> Hugh [the husband] will produce a lower total tax bill than that
> resulting from the Tax Court's conclusion.  This ironic wrinkle in this
> case may simply result from the fact that a wealthier husband sur-
> vived his wife.

Id. n.12.

As the Court of Appeals for the Third Circuit itself pointed out, Estate of

Miller v. Commissioner, 400 F.2d 407, is materially distinguishable from a case

like the instant case involving "consolidated corporate income tax reporting and

attempted double deductions of business losses".  Id. at 411.  Indeed, in such a

case the Court of Appeals for the Third Circuit has applied Charles Ilfeld Co. in

order to prevent the double deduction of the same losses.  See Greif Cooperage

Corp. v. Commissioner, 85 F.2d 365 (3d Cir. 1936), aff'g 31 B.T.A. 374 (1934).

**[\*35]** <u>Greif Cooperage Corp.</u> involved the parent of a consolidated return group that claimed a deduction for losses incurred in connection with the liquidation of certain of its subsidiaries. The Commissioner disallowed those losses because that group had already deducted the operating losses of those subsidiaries. In holding that the Commissioner's position should be sustained, the Court of Appeals for the Third Circuit relied on <u>Charles Ilfeld Co. v. Hernandez</u>, 292 U.S. 62, <u>McLaughlin v. Lumber Co.</u>, 293 U.S. 351 (1934), and <u>Commissioner v. Nat'l Casket Co.</u>, 78 F.2d 940 (3d Cir. 1935), <u>rev'g in part</u> 29 B.T.A. 139 (1933), to support its view that "[t]he law is well settled that liquidating losses such as those incurred by the petitioner in the instant case are not allowable if their allowance results either directly or indirectly in a double deduction by the taxpayer of the same losses." <u>Greif Cooperage Corp.</u>, 85 F.2d at 365.

The precedent of the Court of Appeals for the Third Circuit, <u>Commissioner v. Nat'l Casket Co.</u>, 78 F.2d 940 (3d Cir. 1935), on which that court relied in <u>Greif Cooperage Corp.</u> also involved a consolidated return group where the Commissioner had disallowed what the Commissioner determined to be double deductions by that group. In that case, a subsidiary in that group had certain operating losses (subsidiary operating losses) that the consolidated return group had deducted for taxable years preceding the taxable year at issue. Thereafter, the

[*36] parent of the consolidated return group dissolved that subsidiary and claimed for the taxable year at issue a deduction for a loss (investment loss) with respect to the parent's investment in that dissolved subsidiary. The Commissioner disallowed that claimed deduction. Commissioner v. Nat'l Casket Co., 29 B.T.A. at 139-140. The Board of Tax Appeals (Board) held that the taxpayer was not entitled to deduct the investment loss to the extent that that loss equaled the total amount of subsidiary operating losses that the subsidiary in question had over the period in which it was a member of the consolidated return group, reduced by the operating gains or profit that that subsidiary had over that same period. Id. at 141.

The Court of Appeals for the Third Circuit reversed the decision of the Board "in so far as it allowed the operating losses of the subsidiary to be reduced by the profits of the subsidiary." Commissioner v. Nat'l Casket Co., 78 F.2d at 942. In so doing, the Court of Appeals began its analysis by quoting and relying on the following excerpt from Charles Ilfeld Co.:

> "Where all the members gain, total taxable income is the same on a consolidated return as upon separate ones. But where as in the case before us the subsidiaries lose and the parent gains, the losses of the former go in reduction of the taxable income of the latter. Considerations that justify inclusion of the profits made by all the members do not support the double deduction claimed."

Id. (quoting Charles Ilfeld Co. v. Hernandez, 292 U.S. at 69).

[*37] The Court of Appeals for the Third Circuit then paraphrased and applied the above-quoted excerpt to the issue before it as follows:

> We paraphrase this statement and apply it to the instant case: Where, in 1925, both the * * * [parent] and the subsidiary gained, the total taxable income was the same on the consolidated return as upon separate ones. Where, however, the subsidiary sustained losses and the * * * [parent] gained, the losses of the former went in reduction of the taxable income of the latter. The effect of this is that the * * * [parent]'s tax burden remained the same in 1925, the year when the subsidiary gained, but was lessened in 1926, 1927, and 1928, the years when the subsidiary lost. In the instant case the * * * [parent] took credit in 1926, 1927, and 1928 for the gross operating losses sustained by the subsidiary and thereby reduced the income tax which it would have been obliged to pay on its own gross profits for the three years in question. The fact that an income tax was paid on the profit earned by the subsidiary in 1925 did not increase the income tax the * * * [parent] was obliged to pay on its own profit for that year. In our opinion, credit for the investment loss should be allowed only to the extent to which the investment loss exceeds the credit already taken by the * * * [parent] for the operating losses sustained by the subsidiary during the three years in question [of subsidiary losses]. In effect, what the Board did when it reduced the [subsidiary] operating losses by the 1925 profit was to allow the * * * [parent] to take credit for a profit. [Emphasis added.]

Id. at 942.

The lesson of the opinions of the Court of Appeals for the Third Circuit in Greif Cooperage Corp. v. Commissioner, 85 F.2d 365, Commissioner v. Nat'l Casket Co., 78 F.2d 940, and Estate of Miller v. Commissioner, 400 F.2d 407, is

**[\*38]** not in doubt. That lesson is that that court will apply <u>Charles Ilfeld Co.</u> in any Federal income tax case involving a consolidated return group where the group claims a deduction for a taxable year for an economic loss that duplicates another deduction already taken by the group for the same economic loss.

The Court concludes that the view of this Court with respect to the application of <u>Charles Ilfeld Co.</u>, as summarized and expressed most recently in <u>Thrifty Oil Co.</u>, is fully consistent with the view of the Court of Appeals for the Third Circuit with respect to the application of <u>Charles Ilfeld Co.</u>, as summarized and expressed in <u>Greif Cooperage Corp.</u>, <u>Nat'l Casket Co.</u>, and <u>Estate of Miller</u>. Accordingly, as the Court did in <u>Thrifty Oil Co.</u>, the Court will first determine in the instant case whether the respective deductions under section 165 (1) for taxable years 2002 and 2003 of a total of $199,114,494 of (a) the 2002 asset losses in question and (b) the 2003 asset losses in question and (2) for taxable year 2001 of $199,114,494 of the 2001 stock loss in question "represent the same economic loss[es]", <u>Thrifty Oil Co. v. Commissioner</u>, 139 T.C. at 212, to petitioner. If the Court concludes that those respective deductions do represent the same economic losses to petitioner, the Court will determine whether a specific provision exists "demonstrating Congress' intent to allow the double deductions". <u>Id.</u>

**[*39]**  It is respondent's position that, by claiming the respective deductions for

taxable years 2002 and 2003 that are attributable to the 2002 asset losses in

question and the 2003 asset losses in question after having previously taken a

deduction for taxable year 2001 that is attributable to the 2001 stock loss in

question, petitioner is "recogniz[ing] a single economic loss a second time."[16]  In

support of that position, respondent asserts that "the depressed value of the

original AS [AquaSource] stock at year-end 2001 reflected the depressed value of

AS assets at that time, so that the loss on the 2001 transfer of stock and the losses

on the sale of those assets in 2002 and 2003 represent the same economic loss."

It is petitioner's position that there exists a genuine dispute of material fact

as to "whether, and to what extent, the 2003 Asset Losses actually 'duplicate' the

2001 Stock Loss [in question]."  In support of that position, petitioner asserts:

> Respondent relies on a flawed methodology that is inconsistent with
> his own regulations for determining that $199,114,494 of Petitioner's
> 2002 and 2003 Asset Losses purportedly "duplicated" the 2001 Stock
> Loss [in question].  If Petitioner's Motion is denied, Petitioner will
> challenge at trial Respondent's erroneous determination of the
> amount of purported duplicated losses.  Accordingly, there is a

---

[16]Respondent acknowledges that (1) the respective deductions for taxable years 2002 and 2003 that are attributable to the 2002 asset losses in question and the 2003 asset losses in question and (2) the deduction for taxable year 2001 that is attributable to the 2001 stock loss in question duplicate the same economic loss to petitioner only to the extent of $199,114, 494, the amount of the deduction for taxable year 2001 that is attributable to the 2001 stock loss in question.

**[*40]** material issue of fact as to the amount of losses that were duplicated
* * *

Respondent counters:

> It is undisputed that petitioner claimed a stock loss of $199,114,494
> based on a December 31, 2001 sale of AS [AquaSource] stock.  It is
> also undisputed that petitioner claimed losses on AS asset sales in the
> amounts of $59,584,738 and $192,835,360 in the years 2002 and
> 2003, respectively.  It is further undisputed that, by the end of 2003,
> all assets of AS had been sold.  There can be no genuine dispute that
> a decrease in the value of the assets of a corporation and the decrease
> in value of the stock of the corporation represent the same economic
> decline in value.  Based on the above, respondent has established
> facts demonstrating beyond dispute that the 2002 and 2003 asset
> losses duplicated the 2001 stock loss to the extent of $199,114,494.
> [Fn. refs. omitted.]

The Court agrees with respondent that "[t]here can be no genuine dispute

that a decrease in the value of the assets of a corporation and the decrease in value

of the stock of the corporation represent the same economic decline in value."

The 2001 stock loss in question for which petitioner claimed a deduction for

taxable year 2001 is attributable to petitioner's claimed sale on December 31,

2001, of certain class A stock of AquaSource that petitioner owned.  The 2002

asset losses in question and the 2003 asset losses in question for which petitioner

claimed respective deductions for taxable years 2002 and 2003 are attributable to

AquaSource's sales in 2002 of certain of its assets and its sale in 2003 of all of its

remaining assets.  The value of petitioner's class A stock in AquaSource at the end

**[*41]** of 2001 reflected the value of all of the assets that AquaSource owned at that time and that it sold in 2002 and 2003.

The Court concludes that there is no genuine dispute of material fact as to whether the respective deductions (1) for taxable years 2002 and 2003 of a total of $199,114,494 of (a) the 2002 asset losses in question and (b) the 2003 asset losses in question and (2) for taxable year 2001 of $199,114,494 of the 2001 stock loss in question "represent the same economic loss[es]", Thrifty Oil Co. v. Commissioner, 139 T.C. at 212, to petitioner.[17] The Court further concludes that the respective deductions (1) for taxable years 2002 and 2003 of a total of $199,114,494 of (a) the 2002 asset losses in question and (b) the 2003 asset losses in question and (2) for taxable year 2001 of $199,114,494 of the 2001 stock loss in question

---

[17]The Court notes that petitioner's bald assertions that if the Court were to deny petitioner's motion with respect to respondent's alternative determinations, "there is a material issue of fact as to the amount of losses that were duplicated" and that "[p]etitioner will challenge at trial Respondent's erroneous determination of the amount of purported duplicated losses" do not establish that there is a genuine dispute of material fact requiring the Court to deny respondent's motion. See Rule 121(d) ("When a motion for summary judgment is made * * *, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, * * * must set forth specific facts showing that there is a genuine dispute for trial. If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party.")

**[*42]** "represent the same economic loss[es]", id., and therefore are duplicate or double deductions.

The Court addresses now whether a specific provision exists "demonstrating Congress' intent to allow the double deductions". Id. It is petitioner's position that, even though petitioner has taken a deduction for taxable year 2001 for $199,114,494 of the 2001 stock loss in question, section 165 is the specific provision demonstrating Congress' intent to allow petitioner also to take the respective deductions for taxable years 2002 and 2003 of all of the 2002 asset losses in question and all of the 2003 asset losses in question. In support of that position, petitioner argues that, because section 165 by its terms entitles petitioner to the respective deductions for taxable years 2002 and 2003 of all of the 2002 asset losses in question and all of the 2003 asset losses in question, Charles Ilfeld Co. does not control resolution of the duplicate deductions issue.

In Thrifty Oil Co., the Court considered and rejected an argument of the taxpayer that is very similar to the argument of petitioner in the instant case. There, the taxpayer argued that, because section 162 entitled it to the respective deductions for the years at issue of the environmental remediation expenses at issue in that case, Charles Ilfeld Co. did not control resolution of the duplicate deductions issue. Thrifty Oil Co. v. Commissioner, 139 T.C. at 214. In rejecting

**[\*43]** that argument, the Court concluded that "general allowance provisions are insufficient" to demonstrate the necessary intent by Congress to allow a double deduction.  Id.

The Court concludes that section 165, which is involved in the instant case, like section 162, which was involved in Thrifty Oil Co., is a "general allowance" provision.[18]  The Court further concludes that petitioner has failed in the instant case to "point to a specific provision authorizing the double deduction."  See id.

Before considering certain additional arguments of Duquesne that the Court did not expressly address in Thrifty Oil Co., the Court will address petitioner's objection to the methodology that respondent used to determine the respective amounts of the respective deductions for taxable years 2002 and 2003 of the 2002 asset losses in question and the 2003 asset losses in question that respondent disallowed in the notice in respondent's alternative determinations.  According to petitioner, those determinations "had the effect of treating a greater amount of the 2003 [asset] losses [in question] as 'duplicated' than would have been the case if Respondent had instead treated the 2002 sales [2002 asset losses in question] as

---

[18]In the amicus brief that Duquesne filed in Thrifty Oil Co. Duquesne equated secs. 162 and 165.  It argued there that both the instant case and the Thrifty Oil Co. case involve "deductions * * * being claimed under a long-standing Code provision that, on its face, clearly permits the deduction."

**[*44]** first soaking up the duplicated losses and applied only the remaining duplicated loss to 2003."

As the Court understands the above-quoted excerpt from one of petitioner's filings, if the Court were to conclude, as the Court has, that under Charles Ilfeld Co. petitioner is not entitled to respective deductions for taxable years 2002 and 2003 of a total of $199,114,494 of the 2002 asset losses in question and the 2003 asset losses in question, the Court should reject respondent's determinations to disallow $48,682,648 of the 2002 asset losses in question and $150,431,846 of the 2003 asset losses in question and instead should disallow all, i.e, $59,584,738, of the 2002 asset losses in question and only so much of the 2003 asset losses in question, i.e., $139,529,756, as would, when added to the disallowed amount (i.e., $59,584,738) of the 2002 asset losses in question, equal $199,114,494.

Respondent has the same understanding that the Court has about what petitioner is suggesting in the above-quoted excerpt. Thus, in response to petitioner's objection described above, respondent states:

> Though respondent believes that the allocation between years is a moot point and that, in any event, the allocation he made between the 2002 and 2003 years is reasonable, respondent also notes that petitioner has suggested an alternative allocation. Should it be necessary to address an allocation issue, respondent is willing to agree to the alternative allocation suggested by petitioner.[44] Thus, any potential allocation issue in this case would appear to be resolved.

**[*45]**  [44]Petitioner suggested that the duplicated amount for each of the years 2002 and 2003 be computed as if respondent had treated "the 2002 sales as first soaking up the duplicated loss and applied only the remaining duplicated loss to 2003." (Petitioner's Objection at 26.) This would result in an adjustment of $59,584,738 to the 2002 year and $139,529,756 ($199,114,494 less $59,584,738) to the 2003 year.

[Emphasis added.]

The Court accepts what it understands to be respondent's concession in the above-quoted paragraph (respondent's allocation concession) that if the Court were to conclude, as the Court has, that under <u>Charles Ilfeld Co.</u> petitioner is not entitled to respective deductions for taxable years 2002 and 2003 of a total of $199,114,494 of the 2002 asset losses in question and the 2003 asset losses in question, petitioner is not entitled to (1) any of the $59,584,738 of 2002 asset losses in question and (2) $139,529,756 of the $192,835,360 of 2003 asset losses in question.

The Court turns next, for the sake of completeness, to certain arguments not relating to the application of <u>Charles Ilfeld Co.</u> that Duquesne advanced in its amicus brief in the <u>Thrifty Oil Co.</u> case to which the Court did not specifically respond in <u>Thrifty Oil Co.</u> and that it advances in the instant case. In advancing those arguments there and here, Duquesne places great weight on the state of the consolidated return regulations at the time of the various transfers in question that,

**[\*46]** according to the Commissioner, gave rise to double deductions in <u>Thrifty Oil Co.</u> and in the instant case.[19]

Section 1501 provides that an affiliated group of corporations shall have the privilege of filing a consolidated income tax return.  In section 1502, Congress delegated to the Secretary of the Treasury (Secretary) authority to:

> prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

In 2001, before the 2001 stock transfer involved here took place, the U.S. Court of Appeals for the Federal Circuit (Court of Appeals for the Federal Circuit) considered the validity of the so-called loss disallowance rule that the Secretary had prescribed in section 1.1502-20, Income Tax Regs.[20]  See <u>Rite Aid Corp. v.</u>

---

[19]The taxable years in <u>Thrifty Oil Co.</u> relating to the application of <u>Charles Ilfeld Co. v. Hernandez</u>, 292 U.S. 62 (1934), were taxable years ended September 30, 2000, 2001, and 2002.  The taxable years in the instant case relating to the application of <u>Charles Ilfeld Co.</u> are taxable years 2000, 2001, 2002, and 2003.

[20]Sec. 1.1502-20, Income Tax Regs., the validity of which was before the Court of Appeals for the Federal Circuit, prevented the parent corporation of a consolidated group of companies from claiming a loss on the sale of subsidiary stock to the extent of the subsidiary's "duplicated loss factor" (loss disallowance rule).  The duplicated loss factor was calculated as the excess of the subsidiary's

(continued...)

**[*47]** <u>United States</u>, 255 F.3d 1357 (Fed. Cir. 2001). That rule, which the taxpayer argued in <u>Rite Aid Corp.</u> was an invalid exercise of the Secretary's authority under section 1502, prevented the taxpayer, the parent of a consolidated return group, from deducting under section 165 a loss on the sale of certain stock of one of its subsidiaries. <u>See id.</u> at 1358. The Court of Appeals for the Federal Circuit held that the loss disallowance rule in section 1.1502-20, Income Tax Regs., exceeded the authority that Congress had delegated to the Secretary in section 1502. <u>See id.</u> at 1360. In so holding, the Court of Appeals for the Federal Circuit concluded:

> The purpose of section 1502 is to give the Secretary authority to identify and correct instances of tax avoidance created by the filing of consolidated returns. But section 1502 "does not authorize the Secretary to choose a method that imposes a tax on income that would not otherwise be taxed." *Id.* [<u>Am. Standard, Inc. v. United States</u>, 602 F.2d 256, 261 (1979).] "Income tax liability is not imposed by the Secretary's regulations, but by the Internal Revenue Code." *Id.* Therefore, in the absence of a problem created from the filing of consolidated returns, the Secretary is without authority to change the application of other tax code provisions to a group of affiliated corporations filing a consolidated return.

<u>Id.</u> at 1359-1360.

---

[20](...continued)
adjusted basis in its assets over the value of its assets immediately after the sale of such stock. <u>Rite Aid Corp. v. United States</u>, 255 F.3d 1357, 1358 (Fed. Cir. 2001).

**[*48]** In response to <u>Rite Aid Corp.</u>, the Internal Revenue Service (Service) issued Notice 2002-11, 2002-1 C.B. 526, in which the Service set forth its position with respect to the holding in that case that the loss disallowance rule in section 1.1502-20, Income Tax Regs., was an invalid exercise of the Secretary's authority under section 1502. That notice stated:

> In *Rite Aid*, the Federal Circuit held that the duplicated loss component of § 1.1502-20 of the Income Tax Regulations, which disallows certain losses on sales of stock of a member of a consolidated group, was an invalid exercise of regulatory authority. The Internal Revenue Service believes that the court's analysis and holding were incorrect.
>
> Nevertheless, the Service has decided that the interests of sound tax administration will not be served by continuing to litigate the validity of the loss duplication factor of § 1.1502-20. Moreover, because of the interrelationship in the operation of all of the loss disallowance factors, the Service has decided that new rules governing loss disallowance on sales of stock of a member of a consolidated group should be implemented.

On March 9, 2002, the Service issued Notice 2002-18, 2002-1 C.B. 644, in which it announced the intention of the U.S. Department of the Treasury (Treasury) to promulgate regulations to prevent the duplication of losses within a consolidated return group upon the disposition of the stock of a member of the group. In that notice, the Service stated:

**[*49]** [T]he IRS and Treasury believe that a consolidated group should not be able to benefit more than once from one economic loss. Accordingly, the IRS and Treasury intend to issue regulations that will prevent a consolidated group from obtaining a tax benefit from both the utilization of a loss from the disposition of stock (or another asset that reflects the basis of stock) and the utilization of a loss or deduction with respect to another asset that reflects the same economic loss.

It is petitioner's position in the instant case that "the result sought by Respondent could only be obtained by issuing regulations".[21] In support of that position, petitioner asserts:

> Although Petitioner's 2001 Stock Loss would have been disallowed under the duplication factor of Treas. Reg. § 1.1502-20 had such regulation not been invalidated by *Rite Aid* [*Corp. v. United States*, 255 F.3d 1357, 1360 (Fed. Cir. 2001)] it was considered valid when incurred and claimed in light of *Rite Aid* and the consequent withdrawal of the "loss duplication" regulations. Moreover, the new 2003 regulations [Sec. 1.1502-35T, Temporary Income Tax Regs., 68 Fed. Reg. 12292 (Mar. 14, 2003).], which similarly attack a duplicated loss situation by deferring or denying the stock loss, were not effective in time to cover the 2001 Stock Loss and for other reasons did not operate to disallow the 2003 Asset Losses. At no time did Treasury or Service in these announcements and regulations inform taxpayers that duplicated losses would be attacked under *Ilfeld* in situations

---

[21]In Duquesne's amicus brief, Duquesne argued: "Treasury is responsible for drafting and implementing regulations to address the complexities of the consolidated return regime. When it does not do so, taxpayers subject to that regulatory regime should not be expected to set aside the plain meaning of applicable Code provisions and fill in regulatory gaps based on nebulous and inconsistently applied judicial principles." Although the Court in Thrifty Oil Co. did not expressly respond to Duquesne's argument, the Court implicitly rejected it when it held that the taxpayer in that case was not entitled to the double deductions at issue there.

[*50] where such losses were not subject to either the invalidated regulations or the new 2003 regulations.

Petitioner argues that, after the Court of Appeals for the Federal Circuit issued its opinion in Rite Aid Corp. and the Service announced its intention to stop litigating cases under the loss disallowance rule, "[n]othing was said [by the Service] about *Ilfeld*, or any intention by the Service to challenge duplicated losses based on theories or principles outside of the consolidated return regulations." Indeed, according to petitioner, the "post-*Rite Aid* announcements and regulations issued by Treasury and the IRS in February and March 2002 made it quite clear that the 2003 Asset Losses [in question] were not subject to challenge as duplicated losses."

Although petitioner's arguments are not altogether clear, it appears that petitioner maintains that the Court does not have the authority to disallow the respective deductions at issue for taxable years 2002 and 2003 that are attributable to the 2002 asset losses in question and the 2003 asset losses in question in the absence of consolidated return regulations promulgated by the Treasury that authorize the disallowance of those deductions. The Court disagrees.

The Court acknowledges that the Court of Appeals for the Federal Circuit, a court to which no appeal in any case in this Court would lie, held in Rite Aid

[*51] <u>Corp.</u> that the loss disallowance rule in section 1.1502-20, Income Tax Regs., was an invalid exercise of the Secretary's authority under section 1502.[22] The Court also is aware that the Service issued several notices setting forth its views on that holding and that case and more broadly on the impropriety of the duplication of deductions for the same economic loss. In addition, the Court agrees with petitioner that, for various reasons, section 1.1502-35T, Temporary Income Tax Regs., <u>supra</u>, does not require the disallowance of the respective deductions for the 2001 stock loss in question, the 2002 asset losses in question, and/or the 2003 asset losses in question. Nonetheless, the Court concludes that <u>Rite Aid Corp.</u>, the several notices that the Service issued after <u>Rite Aid Corp.</u>, and section 1.1502-35T, Temporary Income Tax Regs., <u>supra</u>, do not prohibit the Court from determining whether under <u>Charles Ilfeld Co.</u> duplicate deductions for the same economic loss are allowable.

---

[22]Petitioner's reliance on <u>Rite Aid Corp.</u> in support of its argument that "the result sought by Respondent [in the instant case] could only be obtained by issuing regulations" is misplaced. In <u>Rite Aid Corp.</u>, the Court of Appeals for the Federal Circuit considered and decided "the sole issue [presented to the court in the parties' respective motions for summary judgment] of whether Treas. Reg. § 1.1502-20 was a proper exercise of the Secretary of the Treasury's regulatory authority." <u>Rite Aid Corp.</u>, 255 F.3d at 1358. The Court of Appeals for the Federal Circuit did not consider, let alone decide, whether the duplicated loss at issue in <u>Rite Aid</u> could or should be disallowed on any other ground, including under <u>Charles Ilfeld Co.</u>

**[\*52]** On the basis of the record before the Court and respondent's allocation concession, the Court concludes that petitioner is not entitled to respective deductions for taxable years 2002 and 2003 for (1) any of the $59,584,738 of the 2002 asset losses in question and (2) $139,529,756 of the $192,835,360 of the 2003 asset losses in question, or a total of $199,114,494 of disallowed deductions for those respective taxable years. The Court will deny petitioner's motion insofar as petitioner asks the Court in that motion to allow respective deductions for taxable years 2002 and 2003 for (1) all of the 2002 asset losses in question and (2) all of the 2003 asset losses in question. The Court will grant respondent's motion insofar as respondent asks the Court in that motion to disallow respective deductions for taxable years 2002 and 2003 totaling $199,114,494 of the 2002 asset losses in question and the 2003 asset losses in question.

Statute of Limitations Issue

The parties disagree about whether the period of limitations for taxable year 2000[23] is extended pursuant to section 6501(k)[24] to include the period described in

---

[23]The period of limitations under sec. 6501(a), as extended under sec. 6501(c)(4)(A), for taxable year 2000 expired on December 31, 2006.

[24]As pertinent here, sec. 6501(k) provides:

In a case where an amount has been applied, credited, or refunded under section 6411 (relating to tentative carryback and refund adjustments) by reason of a net operating loss carryback * * * [or] a

(continued...)

[*53] section 6501(h)[25] for purposes of permitting respondent to assess a

deficiency for that taxable year[26] that is attributable to the disallowance of the

---

[24](...continued)
capital loss carryback * * * to a prior taxable year, the period
described in subsection (a) of this section for assessing a deficiency
for such prior taxable year shall be extended to include the period
described in subsection (h) * * *; except that the amount which may
be assessed solely by reason of this subsection shall not exceed the
amount so applied, credited, or refunded under section 6411, reduced
by any amount which may be assessed solely by reason of subsection
(h) * * *

[25]As pertinent here, sec. 6501(h), which creates an exception to the general
rule set forth in sec. 6501(a), provides: "In the case of a deficiency attributable to
the application to the taxpayer of * * * a capital loss carryback * * *, such
deficiency may be assessed at any time before the expiration of the period within
which a deficiency for the taxable year of the * * * net capital loss which results in
such carryback may be assessed." The parties agree that the period of limitations
under sec. 6501(a), as extended in writing under sec. 6501(c)(4)(A), for taxable
year 2003 would have expired on June 30, 2010. Petitioner filed the petition
commencing this case before that date. Pursuant to sec. 6503(a), the period of
limitations for taxable year 2003 that would have expired on June 30, 2010, is
suspended until 60 days after the decision in the instant case becomes final.

[26]The amount of the deficiency that the Commissioner may assess under sec.
6501(k) is limited by that section. See supra note 24.

[*54] 2002 asset losses in question which were carried back from taxable year

2002[27] to taxable year 2000.[28]

According to petitioner:

**Even Assuming *Arguendo* that a Deficiency Exists with Respect to the 2003 Asset Losses Carryback, the Courts and the Service Would Permit Adjustments to the * * * 2002 Asset Losses [in question] for the Purpose of Determining a Deficiency for Petitioner's 2000 Tax Year Only if the * * * 2002 Asset Losses Impact the Amount of the Carryback of the 2003 Asset Losses**.

The Court does not understand what petitioner is attempting to argue with

respect to the statute of limitations issue in the above-quoted passage. What the

Court does understand is the meaning of section 6501(h) and (k) and the operation

of those provisions.

In Jones v. Commissioner, 71 T.C. 391, 397 (1978), the Court explained

section 6501(h) and (k) as follows:

[W]here respondent uses the extended limitations period of section 6501(h), he may assess a deficiency only to the extent that the deficiency is attributable to the application to the taxpayer of a loss carryback. Respondent may not use the extended limitations period

---

[27]The period of limitations under sec. 6501(a), as extended in writing under sec. 6501(c)(4)(A), for taxable year 2002 expired on December 31, 2006.

[28]The parties agree that under sec. 6501(h) the period of limitations for taxable year 2000 has not expired in the case of any deficiency for that taxable year that is attributable to the disallowance of the 2003 asset losses in question that were carried back from taxable year 2003 to taxable year 2000.

[*55] to assess a deficiency attributable to items unrelated to the loss carryback.

> However, section 6501(m) [now section 6501(k)] supersedes subsection (h) restriction on the nature of deficiencies that may be assessed within the extended period.
>
> *        *        *        *        *        *        *
>
> Where there is a refund granted under section 6411 by reason of a net operating loss carryback, respondent may thus assess within the extended period a deficiency on grounds not attributable to the carryback so long as the deficiency does not exceed the amount of the refund reduced by any amount of the deficiency actually attributable to the carryback. *Maxcy v. Commissioner*, 59 T.C. 716, 730 (1973). In other words, the amount of deficiency *attributable to* the disallowance of the loss carryback is assessable under and subject to the limitations of section 6501(h). And the rest of the total tentative refund is assessable under and subject to the limitations of section 6501(m) [section 6501(k)]. See H. Rept. 2161, 89th Cong., 2d Sess. (1966), 1966-2 C.B. 902, 905; sec. 301.6501(m)-1(a)(2) (example), Proced. & Admin. Regs.

On December 23, 2003, petitioner filed Form 1139, in which it carried back from taxable year 2002 $63,349,715 of long-term capital losses to taxable year 2000, $59,584,738 of which was attributable to the 2002 asset losses in question. Pursuant to section 6411, respondent paid petitioner a tentative refund of $12,669,943 with respect to Form 1139 that it had filed.

On April 23, 2004, petitioner filed Form 1139, in which it carried back from taxable year 2003 $184,874,430 of long-term capital losses to taxable year 2000.

[*56] Thereafter, on December 23, 2004, petitioner filed a second Form 1139, in which it carried back from taxable year 2003 $16,531,429 of long-term capital losses to taxable year 2000.  Thus, a total of $201,405,859 of long-term capital losses was carried back from taxable year 2003 to taxable year 2000, $192,835,360 of which was attributable to the 2003 asset losses in question. Pursuant to section 6411, respondent paid petitioner tentative refunds totaling $40,281,401 with respect to the two Forms 1139 that it had filed.

On the basis of the record before the Court,[29] the Court concludes sua sponte[30] that pursuant to section 6501(k) the period of limitations for taxable year 2000[31] is extended to include the period described in section 6501(h) for purposes of permitting respondent to assess a deficiency for that taxable year that is attributable to the disallowance of the 2002 asset losses in question which were

---

[29]Respondent agrees with petitioner that there is no genuine dispute of material fact with respect to the statute of limitations issue.

[30]Respondent does not ask in respondent's motion that the Court grant summary adjudication in favor of respondent on the statute of limitations issue. Respondent, however, opposes petitioner's request in petitioner's motion that the Court grant summary adjudication in favor of petitioner on the statute of limitations issue.

[31]See supra notes 23 and 28.

[*57] carried back from taxable year 2002[32] to taxable year 2000. The amount of that deficiency for taxable year 2000 that respondent may assess solely by reason of section 6501(k) may not exceed the amount of the tentative refund that respondent paid to petitioner under section 6411 for taxable year 2000, "reduced by any amount which may be assessed [for taxable year 2000] solely by reason of * * * section [6501](h)".[33] Sec. 6501; see Jones v. Commissioner, 71 T.C. at 397. The Court will deny petitioner's motion insofar as petitioner asks the Court in that motion to conclude that section 6501(k) does not extend the period of limitations for taxable year 2000 to include the period described in section 6501(h) for purposes of permitting respondent to assess a deficiency for that taxable year that is attributable to the disallowance of the 2002 asset losses in question which were carried back from taxable year 2002 to taxable year 2000 and that is in an amount which does not exceed the limitations prescribed by section 6501(k).

---

[32]See supra note 27.

[33]See supra note 24.

**[*58]** The Court has considered all of the respective arguments and contentions of the parties that are not discussed herein, and the Court finds them to be without merit, irrelevant, and/or moot.[34]

To reflect the foregoing and respondent's concessions,

<u>An appropriate order and decision</u>

<u>under Rule 155 will be entered</u>.

---

[34]As discussed above, <u>see</u> <u>supra</u> note 11, petitioner asks the Court in petitioner's motion to grant summary adjudication in its favor on certain issues in addition to the issues that the Court addresses herein.  The Court's holdings herein and certain concessions of respondent, <u>see</u> <u>supra</u> note 10, have made those other issues moot, and the Court will not consider them and will deny petitioner's motion with respect to them.  Thus, there are no unresolved issues that remain in this case.